**In the Matter of F. H. DONOVAN PAINT-ING CO., Inc., Bankrupt.**
**No. 60B–365.**

United States District Court
E. D. Missouri, E. D.
Feb. 15, 1963.

McDonald, Barnard, Wright & Timm, St. Louis, Mo., for Claimant Home Indemnity Co.

Ackerman & Schiller, Gideon H. Schiller, Clayton, Mo., for bankrupt.

Donald Kramer, St. Louis, Mo., Trustee.

REGAN, District Judge.

The Court having before it Referee's Certificate on Petition of Home Indemnity Company for Review of Order filed November 16, 1962, allowing Claim No. 53 of Home Indemnity Company as a wage priority claim in the amount of $17,974.25, but subordinating payment of said amount to Tax Claim No. 40 of the United States and Tax Claim No. 38 of the State of Texas, and allowing the remainder of Claim No. 53 as a general unsecured claim; and the record before the Referee concerning said claim and Trustee's objections thereto including said Home Indemnity Company's petition for review of Referee's Order, the Referee's Memorandum and Order hereinabove referred to as well as memoranda of counsel, and having heard the argument of counsel thereon, and being fully advised in the premises, and having fully considered the matter, doth order, adjudge and decree that the said order of the Referee is correct, and that the Findings of Fact and Conclusions of Law contained in said Memorandum in support of said Order are correct, and that said Order and Findings of Fact and Conclusions of Law be and they are hereby affirmed in each and every respect and adopted as the Order and Findings of Fact and Conclusions of Law of this Court, and that the prayer contained in said Petition for Review of the Referee's Order must be, therefore, and it is hereby denied.

The memorandum of William H. O'Herin, Referee in Bankruptcy follows:

Bankrupt is a corporation, which engaged in the general painting contracting business. It filed a voluntary petition in bankruptcy May 4, 1960, was that day adjudicated a bankrupt, and an order of general reference entered.

Home Indemnity Company filed a claim, designated as claim No. 53 herein, in the amount of $90,141.68 of which the major portion is claimed as a wage priority under Section 64, sub. a (2) of the Bankruptcy Act, alleging that claimant is assignee of wage claims paid by claimant, which wages were owed workmen by bankrupt. Trustee, by his attorney, filed objections to the claim and thereafter amended objections, the substance of which will be hereinafter set forth. The matter was submitted upon stipulated facts and documentary evidence. The facts giving rise to this controversy are as follows:

Robertson Construction Company of Los Angeles, California, was the general contractor for the construction of five hundred housing units at Ft. Hood, Texas, under the Capehart Housing Act. Donovan Painting Company, bankrupt, was the painting subcontractor for all the units. There were five separate painting subcontracts between Robertson and bankrupt. Such were apparently required because applicable to different housing units, each under a separate F.H.A. Project, and designated Mortgage Area No. 1 to Mortgage Area No. 5 inclusive. In each instance Home Indemnity Company as surety executed a labor and material payment bond and a performance bond. In all of these bonds Donovan Painting Company is principal and Robertson Construction Company is the named obligee.

These five subcontracts, and the respective bonds applicable thereto, are marked Exhibits 1 to 5 and so denominated in the stipulation of facts filed.

The terms of the five subcontracts are identical except as to the number of units covered, contract price therefor and identification of the project area. With the same exceptions, the five labor-material and performance bonds are identical in their terms, the amount of the bond in each instance however being one-half of the contract, in accordance with the bond requirements of the contracts. The five contracts aggregated $258,500.-00. The performance bonds were for a total amount of $129,250.00 as were the payment bonds. As this controversy involves the work as a whole, it is unnecessary to further refer separately to each of the subcontracts and bonds, except that the five subcontracts were executed in Los Angeles, California, January 15, 1959 and the bonds at St. Louis, Missouri, January 20, 1959.

The applications containing the indemnity agreement were executed at St. Louis, Missouri, February 20, 1959. The indemnity agreements are binding here on Donovan Painting Company. The question of personal liability of Robert Donovan and Edith Donovan, who also signed the indemnity agreements, is not an issue here and no opinion is expressed thereon.

Thereafter Donovan Painting Company proceeded with the painting work under the contracts. March 31, 1960, Donovan Painting Company notified Home Indemnity Company by letter (Exhibit 6) that it was unable to meet current payrolls and considered itself in default of its obligations under the contracts with Robertson Construction Company. This letter requested the surety company to make arrangements to complete the project in accordance with the terms of the bonds. A postscript to this letter stated that a voluntary petition in bankruptcy would be filed within five days.

Under the same date bankrupt wrote Robertson Construction Company at its office in Killeen, Texas (Exhibit 7), that bankrupt had advised Home Indemnity Company of bankrupt's inability to meet current payrolls, of its default under the contracts and had directed the surety company to arrange for completion of the project in accordance with the terms of the bonds. This letter requests Robertson that any amounts to become due on the contracts be reserved and paid to the surety company.

Donovan Painting Company stopped the operation March 31, 1960 and Home Indemnity took over the operation at that time. In so doing it did not hire subcontractors but employed the supervisory personnel of bankrupt, had them direct and supervise the work and completed the contract. The surety company used some of the old workmen and hired new ones. (Tr. p. 11, 12); (Paragraph 3, page 2 of claim No. 53); (Paragraph 6 of Stipulation).

This action was taken in accordance with the surety company's contractual rights under the five applications for the bonds, which applications were executed by bankrupt. The terms of these applications are identical except as to the amount of each contract and bond. Such are part of Exhibits 1 to 5. It is there provided that the surety company shall

have the right and is authorized "in the event of any abandonment or forfeiture of the contract guaranteed by said contract bond or of any breach of said contract bond, to take possession of the work under said contract, and at the expense of the undersigned to complete, or to contract for the completion of, the same, or to consent to the reletting or completion thereof by the Obligee in said contract bond."

From that time to completion of the contract, Home Indemnity Company paid the workmen and supervisory personnel with its checks. Withholding and social security taxes were deducted from the gross wage and the net paid the worker. The surety company in turn paid these taxes together with the employer's share of current social security taxes to the government. It also paid the Texas Unemployment Compensation current payroll taxes. At the time it took over the contract, the surety company also took over all equipment, materials and supplies that bankrupt had on the job and thereafter during performance of the contracts made additional purchases.

From the date of default March 31, 1960, to the date of bankruptcy May 4, 1960, Home Indemnity Company paid wages in the aggregate amount of $39,-711.11, for which it here claims priority. At the time of default bankrupt owed wages for the week ending March 22, 1960 in the aggregate amount of $8,901.-57. These wages were paid by checks drawn on a special account opened by the Home Indemnity Company in the name of James F. Williams, trustee for Home Indemnity Company at The First National Bank of Killeen, Texas. Each payroll check bears on the back immediately above the endorsement of the payee this stamped statement:

"In payment of wages for week of March 22, 1960 and assign to Home Indemnity Company my claim for these wages due from F. H. Donovan Painting Company, Inc." (Exhibit 10).

Subsequent to April 5, 1960, the surety paid out of this account eight wage checks aggregating $576.79 covering wages earned by certain of bankrupt's employees for the weeks ending March 1st, 8th and 15th, 1960. These checks bore the same above quoted assignment.

In addition, bankrupt at the time of default owed wages for the week ending March 29, 1960 in the amount of $8,-495.89. These wages were paid by Home Indemnity Company. Each payroll check likewise bears a stamped assignment on the back as follows:

"In payment of labor, material and/or services on Fort Hood, Texas, painting contract of F. H. Donovan Painting Company, Inc., and hereby assign to the Home Indemnity Company to the extent of the payment herein claim against F. H. Donovan Painting Company, Inc.".

These items aggregating $17,974.25, are also claimed as wage priorities.

The last above quoted assignment appears on the payroll checks issued in payment of wages from the time of default to completion of the job.

Subsequent to the date of bankruptcy May 4, 1960, the surety company paid wages in the amount of $14,599.89 for which priority is claimed. In addition to wages paid, surety paid an aggregate of $40,528.52 for materials. What proportion of this was for materials bankrupt purchased prior to default does not appear. However, there are no claims filed herein by materialmen which include materials furnished bankrupt on the Fort Hood job prior to default. Surety advanced to bankrupt prior to default, the sum of $7,969.77. Taxes, state and federal, accruing during operation of the job by the surety company, were paid in the amount of $9,926.20. Insurance premiums for compensation and liability insurance were paid in the amount of $1,-117.48.

During the operation by the surety company, it paid "expenses or bonuses to foremen" (Par. 5A Stip. of Fact), in the amount of $2,406.10. It does not appear if these payments were made pursuant to contract or were gratuities.

The item cannot be allowed as a claim in bankruptcy.

There were miscellaneous expenditures amounting to $4,695.60, of which $554.24 was for adjustment services (Par. 5R Stip. Fact). The circumstances of payment of adjustment services or the necessity therefor does not appear in evidence. This item cannot be here allowed. The balance of the miscellaneous expenditures are not questioned and will be allowed as a general claim.

Home Indemnity Company was paid $49,304.87 by Robertson Construction Company upon completion of the job, which was the unpaid balance on the contracts. Of this amount, $22,212.35 is identified as the retained percentage at the date of default March 31, 1960.

The surety company realized on salvage of vehicles, materials and refunds, the sum of $4,078.03.

Trustee has liquidated all assets except two pending plenary actions based on alleged preferential transfers aggregating $15,113.75. Trustee has $27,967.-10 cash in the estate. Recovery in the preferential transfer suits is problematical.

The United States has filed a tax priority claim in the amount of $31,855.-91, designated as claim No. 40. Included in this claim are F.I.C.A. taxes in the amount of $3,333.08, and withholding taxes in the amount of $10,654.80 owed by bankrupt on the Fort Hood Housing Project for the first quarter of 1960.

The state of Texas has filed a claim for state unemployment taxes in the amount of $2,995.27 owed by bankrupt on the Fort Hood Housing Project for the first quarter of 1960. This claim asserts a statutory lien under Texas law and a tax priority. As there is no property in this estate on which the alleged lien attaches, the claim constitutes a tax priority claim in the same class as the claim of the United States.

Trustee's amended objections to the claim are briefly, a call for strict proof; written instruments not attached to the claim and failure to state details therein of expenditures. There is no merit to such objections as all are met by the evidence at the trial. Another objection without merit is untimely filing. This was overruled at the trial, as the claim was filed within the statutory time (Tr. pp. 9, 10). The remainder of the objections may be summarized as denial of the right to priority in any event, for the reason that the wage payments were surety's obligation under its contracts; no separate consideration for the assignments; that claimant is not entitled to priority over creditors who are members of the class covered by the bonds; that in the event any part of the claim is found to be a priority, such is subject to offset and credit of any payments the surety company received from the general contractor.

Section 64, sub. a of the Bankruptcy Act covering priority of debts provides a second priority (following expenses of administration) for wages, not to exceed $600.00 to each claimant, which have been earned within three months before the date of the commencement of the bankruptcy proceeding, due to workmen.

The payrolls for the weeks ending March 22, 1960 and March 29, 1960 in the aggregate amount of $17,397.46, and the eight wage checks aggregating $576.79 for the weeks ending March 1st, 8th and 15th, 1960, paid direct to the individual employees of bankrupt by the surety company, were for wages earned by bankrupt's workmen within three months of bankruptcy and in no individual instance exceeded the sum of $600.00. These debts owed the employees were entitled to be allowed as a wage priority in the hands of the employees. However, the surety company paid the employees direct and in each instance received an assignment of the claim, as evidenced by the endorsement on the back of each check.

█ The assignment of the wage claims carry with them into the hands of the assignee the same priority they had in the hands of the original owners of the claims. This has been settled law since Shropshire, Woodliff & Co. v. Bush,

204 U.S. 186, 27 S.Ct. 178, 51 L.Ed. 436, where it was held that the statutory wage priority attached to the debt and not to the person of the creditor. The claimant here is entitled to a wage priority claim in the amount of $17,974.25 and to be so paid, unless found subject to subordination or credit of payments received from the general contractor, which matters are hereinafter ruled.

■ The wages paid after the surety company took over the operation March 31, 1960 and up to the date of bankruptcy, May 4, 1960, aggregating $39,711.11, are in a different category.

■ At that time the surety company took possession of the work under the contract and completed same in accordance with its contractual obligation and right so to do. It did not subcontract the work, but hired direct some of the employees who had been working on the job, and hired other new employees. It deducted income withholding and payroll taxes, federal and state, and paid same to the governments. It supervised and controlled the work. Donovan Painting Company, the bankrupt corporation, did not participate in the operation after it defaulted and abandoned the contract. The workers who were paid these wages during this period were employees of the surety company, and not of the bankrupt. Divine v. Levy, D.C., 36 F.Supp. 55; Walling v. Sanders, 6 Cir., 136 F.2d 78; Rosell v. Barcus, 89 F.Supp. 234 (D.C.Mo.); Schultz v. Moerschel Products Co., 142 S.W.2d 106, 109 (Mo. App.); Sec. 3401(d) Internal Revenue Code 1954. This portion of the claim is not a wage priority under the Bankruptcy Act. It is allowable only as a general claim.

In its contention that this portion of the claim is a wage priority, claimant relies upon the case of In re Dutcher, 213 F. 908 (D.C.Wash.1914). In that case a contractor was performing construction work under a contract with a city, and a surety company was surety on the contractor's bond to the city, one of the conditions of which was that workmen's wages would be paid. On June 8, 1911,

the contractor abandoned the contract and was that day adjudicated a bankrupt. Thereafter, the surety company completed the work under the contract. The surety company furnished money to pay wages of the contractor's employees and an assignment of the wage claims was taken for the benefit of the surety company. The assigned claims were allowed as wage priorities by the referee in bankruptcy.

The trustee and creditors filed a petition for review in which it was contended that the surety company was not entitled to the benefit of the workmen's right of priority, either by virtue of the assignment or the doctrine of subrogation, for the reason that the surety company under the terms of its bond was primarily liable for the payment of the claims. The court answered this contention by stating that while the obligation as to the workman was primary, yet, as between the principal and surety, the liability of the surety was collateral; that the surety company was liable only because the bankrupt contractor was liable, and when it paid this debt the bankrupt could not say as between himself and the surety company that the debt was discharged. The facts as stated by the court do not specifically show that the wages were those earned prior to June 8, 1911, the date of default by the contractor and the date of bankruptcy, but this must have been the case because otherwise the court would not have stated the surety paid the debt of the bankrupt and the surety company could not have had a provable claim in bankruptcy within the provisions of the Bankruptcy Act. The Dutcher case has never been cited by a Federal Court. Upon the facts apparently there presented, the decision is correct. If it be contended it is authoritative otherwise, it is neither persuasive nor controlling here.

■ The foregoing also applies to all wages paid subsequent to the date of bankruptcy. The only possible priority that could be claimed for such wages would be as an expense of administration. However, after the filing of the

bankruptcy petition, bankrupt was not authorized by the court to conduct any business, execute any contracts, or employ any person, and it did not so do. There could be no wage obligations as expenses of administration. The surety company's right to have its claim allowed for wages paid subsequent to date of default, when it took over the work, up to completion thereof, is like its other payments, based on the contract of indemnity of bankrupt contained in the applications.

Trustee contends that the surety company is not entitled to priority over claimants herein who are included in the class of creditors protected by the bonds, particularly claims for payroll, taxes due the United States and the state of Texas. All creditors covered by the bond have been paid by the surety company excepting payroll, taxes accruing on the job prior to default, and owed the United States and Texas. Claimant asserts that these tax claims were not obligations of bankrupt which it was required to pay under its contracts. No obligations so to do is found in the terms of the labor and material payment bonds.

The performance bonds in each instance refer specifically to each subcontract between Robertson Construction and Donovan Painting Company and then state "copy of which subcontract is by reference made a part hereof".

■ The subcontract is a part of the surety contract and is to be considered in its interpretation. Massachusetts Bonding & Insurance Co. v. Feutz, 182 F.2d 752, 756 (C.A. 8th Cir.).

The condition of the bonds is that Donovan Painting Company shall faithfully perform such subcontract or indemnify and save harmless Robertson Construction Company from all cost and damage by reason of Donovan's failure so to do.

Clause 6 of the subcontracts provides as follows:

"6. *UNEMPLOYMENT INSURANCE AND TAXES:* Subcontractor shall accept full and exclusive liability for the payment of any and all taxes and contributions for unemployment insurance, old age retirement benefits and life pensions and annuities which may now or hereafter be imposed by the United States or any State, whether measured by the wages, salaries or remuneration paid to persons employed by Subcontractor or otherwise, for the work required to be performed hereunder. Subcontractor shall comply with all Federal and state laws on such subjects, and all rules and regulations promulgated thereunder, and shall maintain suitable forms, books and records and save Contractor harmless from the payment of any and all such taxes and contributions, or penalties. Subcontractor shall likewise pay any and all taxes, sales taxes, use taxes, excise, assessments or other charges levied by any governmental authority on or because of the work to be done hereunder, or any equipment, supplies or materials used in the performance thereof."

The first portion of this clause by its terms includes unemployment and social security taxes and the employer's contributions. Chapter 21 of the Internal Revenue Code (1954), pertains to the Federal Insurance Contributions Act. Section 3101 imposes a tax on the wages of the employee. Section 3102 requires the employer to make this deduction from the wages as paid and imposes on the employer liability for the payment of such taxes. Section 3111 imposes a like tax directly upon the employer. Chapter 23 of the Internal Revenue Code (1954), is the Federal Unemployment Tax Act, Section 3301, imposes upon the employer a tax of three percent of wages paid.

The Texas Unemployment Compensation Act, Article 5221b, Vernon's Civil Statutes of Texas, 1925 as amended, Vernon's Ann.Civ.St. art. 5221b–1 et seq., imposes upon the employer a tax of 2.7 percent of wages paid, as the employer's contributions to the state unemployment fund.

These statutory taxes, federal and state, accruing during the first quarter of 1960, ending March 31st, are direct obligations of Donovan Painting Company, incurred while it was performing the work on the Fort Hood Project prior to the default. These taxes are included in the claims of the United States and the state of Texas and have not been paid.

Under its contract, Donovan Painting Company accepted full and exclusive liability for the payment of these taxes. Under its performance bond, surety guaranteed faithful performance of such contract. The performance bond contains no clause limiting the class of persons who may maintain an action under the bond. In United States v. Phoenix Indemnity Co., 231 F.2d 573, (C.A. 4th), the government brought suit against sureties on a performance and payment bond executed by a contractor as principal to recover federal unemployment taxes, withholding taxes and social security taxes which accrued during process of construction work. The obligee in the bonds was the Housing Authority of the City of Fayetteville, North Carolina.

The construction contract provided that the contractor should "provide and pay for all materials, labor, * * * taxes legally collectible because of the work and all other services and facilities of every nature whatsoever necessary to execute the work under the contract." The condition of the performance and payment bond was that if the principal should "well and truly perform and fulfill all the undertakings, covenants, terms, conditions and agreements of the construction contract * * *" and if the principal should "promptly make payment to all persons supplying labor and materials in the prosecution of the work * * *" then the obligation should be void, otherwise to remain in full force.

The court held that the sureties were liable for all the taxes mentioned and that the government was entitled to maintain the action as a third party beneficiary. The opinion states l. c. 575 of 231 F.2d:

"Our conclusion is based upon the provisions of the bond under which the sureties guaranteed the performance of all covenants and agreements undertaken by Crystal Lumber Co. in the contract, and these included the agreement to pay all the taxes collectible because of the work, a provision plainly broad enough to cover not only the taxes payable by the employer, such as unemployment taxes and the employer's portion of the Federal Insurance Contributions taxes, but also the withholding taxes which are credited on the income taxes due by the employees and the employees' portion of the Federal Insurance Contributions taxes. It is to be noted that the contract was referred to in the bond and hence the contract may properly be regarded as a part of the sureties' undertaking and may be considered in its interpretation. Massachusetts Bonding & Ins. Co. v. Feutz, 8 Cir., 182 F.2d 752, 757: It is true that the United States was not a party to the contract or the bond, but the bond was made for the Government's protection and it is entitled to sue thereon as a third party beneficiary. United States v. Scott, 8 Cir., 167 F.2d 301; American Equitable Assur. Co. of New York v. Helvering, 2 Cir., 68 F.2d 46; Voorhees v. Porter, 134 N.C. 591, 602, 47 S.E. 31, 65 L.R.A. 736."

Claimant cites the following cases in support of its contention that these contracts are not for the benefit of the Governments' taxes, which are distinguishable on the facts. United States v. Island Constructors, Inc., 179 F.Supp. 133 (D.C. Puerto Rico). There the performance bond contained an express provision that "[n]o right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner (Nolla, Galib & Co.) named herein." Nolla, Galib & Co. was the obligee in the bond. The same restriction appears in United States for use of Home Indemnity Co. v. American Em-

ployers' Ins. Co., 192 F.Supp. 873 (D.C. N.D.). In that case the performance bond provided "[n]o right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner herein or the heirs, executors, administrators or successors of Owner", the court stating following this quotation "and the Government cannot recover as a third-party beneficiary as it did in the Phoenix case." 192 F.Supp. l. c. 878.

General Casualty Co. of America v. United States, 205 F.2d 753 (C.A.Tex.), is in no manner in point here. There a contractor entered into a contract with the City of Seguin, Texas, for construction of a fire station. The bond there in question was given by the contractor pursuant to the requirements of a state statute covering the payment of labor and material furnished in the prosecution of the work. The bond provided for faithful performance of the contract and payment of labor and material claims as its condition. No reference appears to any provision of the contract or bond as to taxes. The contractor defaulted. Prior to default he had withheld income taxes and social security taxes from employees' wages and failed to remit same to the Government. Such were sought to be recovered by the United States in an action against the surety, on the theory that such taxes were wages and covered by the bond. The court held such were taxes, not wages, and further, that the Government had failed to comply with a condition precedent to a claim for wages prescribed by the Texas Statute.

In United States v. Seaboard Surety Co., 201 F.Supp. 630 (D.C.Tex.), the Government sought recovery on a subcontractor's bond for taxes. The bond there in question was quite dissimilar in its terms from the performance bond in this case. The relevant provisions are set forth at page 632 of the opinion. The first paragraph of that bond by its terms shows that the intended beneficiaries were persons supplying labor, material, services, utilities or equipment and the court so found. That bond further had a specific provision that it inured to the benefit of and might be sued directly upon by persons furnishing labor, material, services, utilities or equipment. The court found, and rightly so, that the United States tax claim was not within the classifications mentioned. The performance bond here in question contains no such limitations.

The remaining cited case is Atlantic Refining Co. v. Continental Casualty Co., 183 F.Supp. 478 (D.C.Penna.). That was an interpleader action. The principal controversy was whether or not under Pennsylvania law, the contractor had any property right in the retained percentage upon which the Government tax lien might attach at the time of assessment, when materialmen at that time were owed the amount of the retained percentage, the materialmen having been paid by the surety upon default. It was held that under state law the surety's subrogation rights took precedence. The Government made the additional contention that the taxes were covered by the bond. The contract there provided that the "[c]ontractor shall indemnify the Owner against, and hereby accepts full and exclusive liability for the payment of" the taxes. The court pointed out that while the bond was conditioned specifically upon the contractor's paying for labor and material, no where in the bond were taxes mentioned. The court stated the purpose and intention of the Owner "both in spirit and letter" (citing a Pennsylvania state court case) was to protect itself and provide for indemnity; that the surety did not expressly agree to pay the taxes as was the case in Phoenix Indemnity Co. (supra). The court concluded that the contracts were not intended for the benefit of the United States.

In the present case we are not concerned with construction of a labor and material bond. Such was given as a separate bond. It is the contract and the performance bond which are to be construed. The performance bond provides as a condition "if principal shall faithfully perform such subcontract".

The contract provides that the subcontractor "shall accept full and exclusive liability for the payment of any and all taxes" being social security and unemployment taxes imposed by federal or state law. Acceptance of "full and exclusive liability for the payment" means that the taxes will be paid by the subcontractor. Liability is that which one is under obligation to pay. Daube v. United States, Ct.Cl., 1 F.Supp. 771. If there be any doubt that such was the intention of the parties, it is dispelled by the last sentence of the clause, "Subcontractor *shall likewise pay* any and all taxes, sales taxes" etc. (emphasis supplied).

I see no distinction between this agreement to pay taxes and the agreement so to do in United States v. Phoenix Indemnity Co., 231 F.2d 573 (supra). The statement is made that the latter case is distinguished because it involved the general contract while the instant case involves a subcontract. This was also stated in one of the cases cited by claimant. In neither instance are any reasons given why this should be so. In the Phoenix Indemnity Co. case the obligee was a city housing authority. In this case the general contractor is the obligee. In neither case does it appear that the obligee was or is liable for payment of the taxes, which constitute in both cases a liability of the principal on the bond. As far as the question of payment of these taxes is concerned, it is a distinction without a difference.

 While clause 6 of the subcontract in one sentence provides that the subcontractor shall comply with all Federal and state laws on such taxes and all rules and regulations promulgated, and maintain forms, books and records and save contractor harmless from the payment of such taxes, it goes further and specifically provides that the subcontractor will pay the taxes. Why include such latter terms if indemnification of the contractor (who is not liable) was the sole intent of the parties? To say that such is a mere declaration of the subcontractor's statutory liability is to leave those portions of Section 6, that the subcontractor will actually pay these taxes, meaningless. If possible, a court will give effect to all parts of a written contract and construction giving reasonable meaning to all its provisions, will be preferred to one leaving a portion thereof useless or inexplicable. Rothschild v. Jefferson Hotel Co., 56 F. Supp. 315 (D.C.Mo.). Effect is to be given if possible, to every word, clause, and sentence of a written contract. Pillsbury Flour Mills Co. v. Great Northern Ry. Co., 25 F.2d 66 (C.C.A. 8th).

██ The terms of this subcontract are expressly made a part of the performance bond and are a part of the surety's undertaking. In both the states where the contract and bond were executed and the state of performance, a creditor has the right to sue, upon the contract of a third party with a debtor to pay the latter's debt. Horseshoe Pier Amusement Co. v. Sibley, 157 Cal. 442, 108 P. 308; Handlan-Buck Co. v. State Highway Comm., 315 S.W.2d 219 (Mo. Sup.); United States v. Scott, 167 F.2d 301 (C.A.Mo.); Knox v. Ball, 144 Tex. 402, 191 S.W.2d 17, 164 A.L.R. 1453. This bond was made for the protection of the United States and the state of Texas, as to the taxes here involved and such were obligations enforceable against the surety.

 A federal bankruptcy court has equitable power to subordinate claims of some creditors to those of others. Where insolvency supervenes a surety may not share in bankrupt's assets on equal terms with any creditors who are members of the class its bond had been given to protect. American Surety Co. of New York v. Sampsell, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663; American Surety Co. of New York v. Westinghouse Electric Mfg. Co., 296 U. S. 133, 56 S.Ct. 9, 80 L.Ed. 105.

Here the surety seeks, not merely to share equally with the unemployment and social security tax claims, but a priority over them, as wage claims are a second priority, while tax claims constitute a fourth priority. Section 64 Bankruptcy

Act. The federal and state tax claims having equal priority, in the absence of sufficient assets to pay each in full, a dividend thereon is required in distribution. Therefore, only in the event there be sufficient assets to pay both tax claims in full, can it be said that the payroll taxes included in the respective claims have been paid. It follows that the portion of surety's claim here found to constitute a wage priority, must be subordinated in payment to the tax claims of the United States and the state of Texas.

In view of this conclusion, it is not necessary to consider, other than briefly, trustee's argument that the money received by the surety company from Robertson Construction Company representing the retained percentage of contract payments accrued prior to default, and from sale of salvage, be an offset against the claimed priority; and further that such items constitute a preferential transfer, the surrender of which should be exacted as a condition to allowance of the claim. The only authorities cited have to do with general equity power of the Bankruptcy Court to subordinate claims and the return of a preference as a condition to allowance of a claim. The latter proposition in fact is statutory. Section 57, sub. g Bankruptcy Act.

██ Under the terms of the applications for the bonds, Donovan Painting Company, assigned to Home Indemnity Company as collateral security, in case of default by bankrupt under its contract with Robertson, all retained percentages under the painting contract and all materials, machinery, tools and equipment on the job. The surety company acquired an equitable lien on said funds and property and its rights relate back to the time of making the contracts. Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; United States Fidelity & Guaranty Co. v. Sweeney, 80 F.2d 235 (C.C.A. 8th).

██ No other creditors in this proceeding have a lien on the property in question. The surety company's lien arose more than four months prior to bankruptcy and the fact that realization or payment may have been within four months of bankruptcy or even subsequent thereto, does not affect the validity of the lien. United States Fidelity & Guaranty Co. v. Sweeney, 80 F.2d 235 (C.C.A. 8th). All labor and material claims owed by bankrupt at the time of default have been paid by the surety and no such claims are filed in this proceeding. This court cannot in equity rule that such funds must first be applied toward payment of that portion of its claim which constitutes a statutory wage priority. As to the contention that such constitutes a preferential transfer, the Sweeney case ruled expressly that the retained percentage on a contract accrued prior to bankruptcy of the contractor, could not be recovered by the latter's trustee in bankruptcy, on the theory of a preferential transfer, as against the surety.

The claim will be allowed as a wage priority claim in the amount of $17,974.25, to be subordinated in payment to the tax claims of the United States and the state of Texas, and as a general unsecured claim in the amount of $64,611.43.

In conclusion it should be noted that Leonard R. Yocum, attorney for the bankrupt corporation and Robert L. Donovan, appeared at the outset of this hearing and filed on behalf of Robert L. Donovan, as a party in interest, a motion for continuance for the reason that movant required additional time to prepare evidence in opposition to the claim of Home Indemnity Company. In support of the motion, it was therein requested that Mr. Yocum be permitted to testify with reference to matters justifying a continuance. The motion was denied in all particulars at the time and by written order entered that same day (Tr. pp. 2–7).

The court orally ruled that neither the bankrupt nor its officers personally, could participate in the hearing on the claim as the realized assets and claims on file, were such that there could be no

possible surplus in the bankruptcy proceeding for the corporation or its stockholders; that a trustee in bankruptcy had been appointed by the creditors and the trustee had filed objections to the claim (Tr. p. 2).

██ ██ A bankrupt, being insolvent, has no interest in the manner of distribution of the assets among his creditors. The trustee in bankruptcy is the proper person to object to claims and when trustee has taken such action, and in no event can there be a surplus, bankrupt is not to be heard in the matter. Collier on Bankruptcy (14th Ed.) Vol. 3 par. 57.17 p. 252 et seq. and cases cited.

██ It was further ruled that Robert L. Donovan personally had no interest in the proceeding, which would entitle him to participate in the hearing. From counsel's statements that the United States should be represented to protect its interest, it would appear that movant was asserting an interest because of his possible personal liability, as an officer of the corporation, for unpaid corporation taxes. Such an interest is too remote to justify his appearance to oppose the claim in litigation.

██ While the present record does not disclose the pendency of a suit brought by Home Indemnity Company against Robert L. Donovan in the District Court, this court takes judicial note thereof. That suit is based on personal indemnity agreements given the surety company by Donovan in connection with the execution of the bonds here in question. Determination of trustee's objections to the surety company's claim in bankruptcy could in no manner be res adjudicata as to Donovan's liability under those contracts and he has no interest by reason of that suit, which justifies his appearance here. It was so ruled (Tr. p. 4).

An order will enter in accordance with this memorandum.

No findings of fact or conclusions of law are made or given, other than in this memorandum contained.