**IRVING TRUST COMPANY and Fidelity and Deposit Company of Maryland, Plaintiffs,**

v.

**NATIONWIDE LEISURE CORPORATION, et al., Defendants.**

**No. 79 Civ. 0261 (WCC).**

United States District Court, S. D. New York.

June 1, 1982.

Memorandum Opinion Dec. 7, 1981.

Recommended Decision on Class Certification March 12, 1982.

See also, D.C., 93 F.R.D. 102.

---

Hart & Hume, New York City, for plaintiff Fidelity and Deposit Co. of Maryland; Henry James Wallach, New York City, of counsel.

Larry M. Carlin, New York City, for defendants Nationwide Leisure Corp., Stuart Graff and Joel Nadel.

Thomas A. Dickerson, New York City, for class defendants Low, Reiken, Dupack and Klakis.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for U. S.; William J.

Brennan, Asst. U. S. Atty., New York City, Steven Rothenberg, Trial Atty., Civ. Aeronautics Bd., Washington, D. C., of counsel.

CONNER, District Judge:

This interpleader action is before the Court for *de novo* review, pursuant to 28 U.S.C. § 636, of Recommended Decisions of Magistrate Kent Sinclair, Jr. By Memorandum Opinion dated December 7, 1981, 93 F.R.D. 102, and Recommended Decision dated March 12, 1982, familiarity with which is presumed, Magistrate Sinclair has recommended:

(1) certification of the following classes (with class representatives indicated parenthetically) pursuant to Rule 23, F.R.Civ.P.:

*Class 1*: (Low and Reiken) All participants in Nationwide Leisure Corporation ("Nationwide") charter tours to London, England during the period February 4, 1977 through December 2, 1977 who were not lodged in the Kensington Close Hotel, the Park Plaza Hotel, the Royal Kensington Hotel, or a similar hotel;

*Class 2*: (Dupack) All participants in Nationwide charter tours to Munich, Germany during the period April 1, 1977 through November 5, 1977 who were not lodged in a Holiday Inn or similar hotel;

*Class 3*: (Klakis) All participants in the single Nationwide charter tour to Nassau and Paradise Island scheduled for January 22, 1978 through January 26, 1978; and

(2) pursuant to a motion *in limine*, Rule 12(f), F.R.Civ.P., striking the "First Defense" of Fidelity and Deposit Company of Maryland ("Fidelity") except to the extent that such defense is restricted to claims for cancellations provided for in the tour participant contract and only such other individual claims as to which Fidelity can affirmatively demonstrate at trial that a particular tour participant knew of the relevant provisions of the Bond from sources other than the misdescription of such provisions contained in the tour participant contracts.

The Court has reviewed the relevant materials considered by Magistrate Sinclair, the objections and supporting papers submitted by Fidelity, Nationwide, Stuart Graff and Joel Nadel, and the submissions of other interested parties, and has determined to adopt the Recommended Decisions of Magistrate Sinclair for the reasons set forth in the December 7, 1981 and March 12, 1982 opinions of the Magistrate. With one exception,[1] the objections raised before this Court were all presented to the Magistrate, and the Court is in full agreement with the rejection of those positions.

Accordingly, the specified classes are certified pursuant to Rule 23 and the "First Defense" of Fidelity is dismissed in part as specified above.

SO ORDERED.

## MEMORANDUM OPINION

KENT SINCLAIR, Jr., United States Magistrate:

This memorandum addresses the motions for class certification in this action. This court had preliminarily recommended that no classes be certified, *see* Recommendations On Motions Concerning Class Matters, dated December 30, 1980. Then, after a motion for partial reargument on class certification of the putative Dupack, Low, Reiken and Klakis classes was granted and heard, numerous filings were received over a period of several months and oral argument was held. Also, the putative classes conducted discovery on issues raised by them with respect to the adequacy of interpleader notice to persons within the putative classes.[1]

---

1. In an argument apparently not advanced before Magistrate Sinclair, Fidelity urges that tour participants were mere third-party beneficiaries to the surety arrangement between Nationwide and Fidelity and as such were bound by limitations (specifically the 60-day notice requirement) in the bond. The contention is frivolous. Tour participants were not mere third-party beneficiaries whose gratuitous rights were limited to the extent of Nationwide's benevolence. The rights of tour participants had their origin in the requirements of federal law, and as Magistrate Sinclair made clear, Nationwide could not unilaterally or by contract with Fidelity place any limitation on those rights inconsistent with such law.

1. No reargument was sought as to the recommended dismissal and denial of certification as to Goodman and Eichenbaum putative classes

For the reasons that follow, it will be recommended that three classes be certified herein. The recommended class definitions, subject to any definitional suggestions received within twenty (20) days and adopted by the court will be as follows:

*Class 1*: (Low and Reiken) All participants in Nationwide charter tours to London, England during the period February 4, 1977 through December 2, 1977 who were not lodged in the Kensington Close Hotel, the Part Plaza Hotel, the Royal Kensington Hotel, or a similar hotel.

*Class 2*: (Dupack) All participants in a Nationwide charter tour to Munich, Germany during the period April 1, 1977 through November 5, 1977 who were not lodged in a Holiday Inn or similar hotel.

*Class 3*: (Klakis) All participants in the single Nationwide charter tour to Nassau and Paradise Island scheduled for January 22, 1978 through January 26, 1978.

The above definitional frameworks are subject to modification, and no final recommendation of certification shall be made until after the parties' time to comment thereon has run. Further, counsel for the putative classes shall have five (5) days to submit replies to timely comments of other parties. Discretion to recommend decertification at a future date does, of course, remain. *See* Rule 23(c)(1).

1. *Background.*[2]

About one year prior to the commencement of this interpleader action, seven purported class actions were filed in New York courts against Nationwide Leisure Corporation ("Nationwide"). The suits charged Nationwide, a purveyor of charter tours, with fraud, breach of contract and negligence in connection with Nationwide's alleged failure to deliver various promised services, ranging from hotel accommodations to ground, air and sea transportation. Also named as defendants in some of these lawsuits were Irving Trust Company ("Irving") (which acted as depository bank for Nation-

wide) and Fidelity and Deposit Company of Maryland ("Fidelity") (which had issued a $200,000 surety bond for the benefit of Nationwide customers, as required by federal regulations governing tour operators).

After the state actions were instituted, and at the request of Nationwide, Fidelity issued a $200,000 rider to the bond issued in compliance with Nationwide's obligations under regulations of the Civil Aeronautics Board. This rider was issued "solely for the benefit" of the state class action plaintiffs and their alleged classes. *See* Amended Complaint . . . , at ¶ 15.

Thereafter this interpleader action was commenced. At first, only the escrow funds held by Irving as depository bank and amounting to $72,458.60 and the surety bond in the penal amount of $200,000 were interpleaded. Then the state actions were stayed and the rider amounting to $200,000 was interpleaded. *See* Recommendations On Motion For Leave To Amend, dated December 16, 1980; Amended Complaint.

Until the summer of 1980, the state action plaintiffs vigorously resisted all attempts to bring their claims before this court. *See, e.g.,* Dickerson letters of February 8, 1979 and April 22, 1980. Then the state plaintiffs reversed their position, and, the purported class representatives in the state actions having already been named as defendants in the interpleader action, sought certification of class claims against the interpleaded funds and class cross-claims against interpleader defendants Nationwide, Graff and Nadel.

On December 30, 1980, this court recommended that the putative classes not be certified. The court's reasoning was set forth in detail in the Recommended Decisions On Motions Concerning Class Matters, but the essential points can be briefly recounted. As to the putative Klakis class, the court took cognizance of the then unchallenged representation of a Nationwide

or the putative Richman classes. The original allegations of all the putative classes are covered in detail in the court's December 30, 1980 Recommendations.

2. For more complete background information, see Complaint, dated January 16, 1979, Amend-

ed Complaint, dated April 13, 1981, Recommended Decisions On Motions Concerning Class Matters, dated December 30, 1980; Recommended Decision On Motion For Leave To Amend, dated December 16, 1980.

principal (which was mentioned by the state court in the Klakis state action) that all but twenty-one Klakis class members had settled and on that basis found that the Rule 23 numerosity requirement was not met. As to the other classes, there was no basis before the court in the Fall of 1980 for a finding that the class representatives' claims were typical, that common issues would predominate, or that the class mechanism was superior to an interpleader mechanism, which the court was given to believe had been reasonably calculated to result in notification to all those with claims against the interpleaded sums. *See* Rules 23(a)(3), 23(b)(3).

Considering the concessions made by the putative classes on reargument (essentially, narrowing the certifications sought to groups with clear commonality of interests and common factual questions) and the new showing they have made with respect to the Klakis numerosity issue and the value of introducing some class mechanisms within this interpleader action, it will be recommended that three classes with, at a minimum, the definitional limitations set forth in the introduction, be certified. Formal recommendation will not be made, however, until the court has the benefit of all parties' comments filed within twenty (20) days.

### 2. *Resolution of Issues Raised by Reargument.*

The putative classes bear the burden of establishing each element of Rule 23 for certification. *Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). Rule 23(a) requires, as prerequisites to the maintenance of a class action, that the putative class demonstrate that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims . . . of the representatives are typical of the claims . . . of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." In addition, the putative classes must show, pursuant to Rule 23(b)(3) (the portion of Rule 23(b) upon which the putative classes rely), that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

### 3. *Rule 23(a) Prerequisites.*

#### a. *Numerosity.*

It has never been doubted that the Low, Dupack and Reiken classes—each of which has putative members in the hundreds or thousands—satisfied the numerosity prerequisite. However, when motion for certification was first brought on, the court was given to believe that only twenty-one people were in the putative Klakis class, everyone else having settled. Now, the putative Klakis class argues that none, or only a few, Klakis class members have settled, and despite ample opportunity, Nationwide has been unable to support the proposition that more than a handful of persons in the Klakis class have settled. Thus, since about 280 people took the Klakis flight and no *evidence* of widespread settlement has been brought forth, there is no basis for a finding that the numerosity requirement is a bar to certification of the Klakis class.

#### b. *Common Questions.*

During the briefing on reargument, common questions of law and fact have sprouted like dandelions in May; *e.g.*, surety bond and rider coverage (notice requirements as a defense; effect of notice on travel agent; whether any breach of contract covered, or just cancellations and complete non-delivery; who is covered by rider; meaning and effect of decision in Appellate Division on coverage); liability of Nationwide for carrier and hotel failures of services; elements of a fraud action; construction of applicable federal regulation and statutes, including whether a private right of action exists; the circumstances surrounding the diminution of vacation allegedly suffered by the Klakis class; whether the hotel switching course of conduct alleged existed; whether the allegedly inferior hotels were "similar"

to the ones specifically named in the brochures.

### c. *Typicality.*

This prerequisite is satisfied by a showing that the putative class representatives and putative class members have the same or similar grievances. *See* Recommended Decision On Motions Concerning Class Matters, at p. 22. The inquiry into typicality requires a comparison of the hypothetical or actual claims of the putative representative with those of the putative class. *Id.*

When certification was initially sought, the putative representatives (aside from Klakis[3]) sought to represent thousands of persons with multifarious claims, ranging from allegations of non-delivery of hotel accommodations (hundreds of hotels, some identified and some not, in several different countries and cities) to allegations of non-delivery of transportation (trains, boats, planes, jets, hydrofoils). No assurance was offered that the non-deliveries suffered by putative class representatives for which Nationwide is allegedly chargeable were also suffered by putative representees. For instance, the only showing made with respect to the typicality of putative representatives' hotel switching claims was the submission of portions of a Federal Trade Commission report which, instead of containing grounds for a typicality finding, alleged that Nationwide's customers were switched to a wide variety of hotels in different places and that the causes for the hotel switches were diverse and usually the result of overbooking by the *hotels*. These barriers to a finding of typicality were heightened by the putative classes' failure to describe in detail a coherent legal theory of recovery, *e.g.*, if the hotel switch was caused by overbooking, is the claim against the fund, Nationwide, Graff and Nadel or against the hotel?

Now that the putative classes have narrowed their claims and begun to flesh out their legal theories, the major barriers in the way of a typicality finding have been lifted. Only hotel switching remains as a class claim, so there is assurance that the same alleged injury suffered by class representatives for which Nationwide is charged was suffered by class representees. The number of hotels has been shown to be finite. The hotels involved are identifiable. And even if representees were switched to different hotels than representatives, their claims would still be, except for damages, the same as the representatives' claims. Further, the class claimants have clarified their position that the funds and defendants Nationwide, Graff and Nadel are chargeable even where the hotel overbooked, obviating the possibility that the claims of representatives and representees would be against different parties (some of which would have to be brought in) and would rest on wholly different factual and legal bases.

One element of typicality—the requirement that the interests asserted by the representatives not be antagonistic or conflicting with those of the purported class[4] —may, however, be problematic and while not barring certification, may necessitate sub-classing of all three classes. The potential antagonism or conflict between representatives and representees arises from the assertion by Fidelity, Nationwide, Graff and Nadel that no claimant may recover against the bond or rider unless he notified Fidelity or Nationwide of his claim within sixty (60) days after the completion of the charter or tour to which the claim relates. If this assertion is valid there would be a conflict of interest between a representative who gave notice and a representee who did not. This conflict could arise if, due to the finite amounts interpleaded and the to-

---

**3.** It has never been doubted that the Klakis class—composed of those who took a single flight and suffered diminution of services—has representatives whose claims are typical.

**4.** *See, e.g., Tomkin v. Kaysen,* 69 F.R.D. 541, 542 (S.D.N.Y. 1976); *Gates v. Dalton,* 67 F.R.D. 621, 630 (E.D.N.Y. 1975); *Lynch v. Sperry Rand Corporation,* 62 F.R.D. 78, 84 (S.D.N.Y. 1973); *Mersay v. First Republic Corp. of America,* 43 F.R.D. 465, 469 (S.D.N.Y. 1968); 1H. Newberg, Class Actions 1120(k) (1977).

tal number of claimants, only pro rata recovery is possible: it then would be in the representative's interest to insist on the notice requirement as a means of minimizing the number of interpleader claimants in order to maximize pro rata recovery or to make possible full recovery. Similarly, a representative who did *not* give notice might want to maximize his recovery by insisting on the invalidity of the notice requirement. The potential conflict or antagonism exists only as to claims against the bond and rider, and could, if necessary, be eliminated by classing those who gave notice apart from those who did. This notice issue does not affect the class cross-claims, since no party has suggested that notice is a precondition to recovery against Nationwide, Graff and Nadel.

Of course, if the notice requirement does not give rise to a valid defense, no sub-classing would be necessary. Therefore, the validity of the notice requirement as a defense against recovery on the bond and rider is an issue which must be resolved early, so that it can be determined whether sub-classing is necessary. Another reason to resolve this issue immediately is that it affects the claims of interpleader defendants who are not class members, and at least one party has suggested that a determination as to notice is a threshold issue which must be reached before any claim is resolved. *See* Omnibus Brief of Defendant Nationwide ..., at 6–7. Although no formal motion has been made to strike the notice requirement as a defense or for other, similar relief, the court has the power to resolve this issue on its own motion, *see Leonhard v. United States,* 633 F.2d 599, 609, n.11 (2d Cir. 1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295

(1981) (sua sponte dismissal of complaint); *Dodd v. Spokane County, Washington,* 393 F.2d 330, 334 (9th Cir. 1968), so long as notice and an opportunity to be heard is provided interested parties. If this case is to be prevented from becoming more of a Frankenstein monster than it must inherently be, issues affecting class certification should be resolved without delay and not when one of the parties decides that the time is ripe from its strategic point of view. This is true particularly where, as here, no matter outside the pleadings except for the content of certain federal regulations need be considered [5] and there do not appear to be any disputes about the facts material to a resolution of the issue. Pursuant to the court's request, some of the parties have already presented arguments on this issue. Any party desiring to make further submissions on the issue of the sixty (60) day notice requirement in the bond or rider may do so within twenty (20) days.

### d. *Adequacy of Representation.*

This prerequisite is no bar to certification. Whether potential antagonism or conflict exists is relevant here as well as to the typicality prerequisite, but this potential problem would, at most, necessitate sub-classing. The putative representees have submitted affidavits demonstrating an understanding of this action, and class counsel, who has wide experience in the realm of consumer travel class actions, is clearly able competently to prosecute these actions on behalf of the classes.

In conclusion, the putative classes' claims and representatives are such that the prerequisites of Rule 23(a) are satisfied.[6]

---

**5.** Copies of the bond, rider and standard form tour participant contract were attached to and made a part of the pleadings.

**6.** Defendant Nationwide argues that the putative class representatives do not have standing to sue on behalf of all putative class members. The thrust of this argument appears to be that some class members were allegedly switched to hotels A and B while the putative representatives were allegedly switched to hotels C and D

and therefore the representatives do not share in the injury suffered by all putative class members. Defendant relies on some state decisions construing New York State class action requirements.

Although not an express prerequisite to the maintenance of a class action, standing is required of a class litigant just as it is required of every litigant. The representatives here all have standing. They have a personal stake in

### 4. *Rule 23(b) Requirements.*

#### a. *Predominance of Common Questions.*

█ There are many common questions, and possible individual questions identifie⁻ include only (a) whether claimants gave notice; and (b) damages. Unless and until it is determined that failure to give notice within sixty (60) days of tour completion bars claims now, the notice requirement would not present individual questions, and even then it would appear that sub-classing would make the issue of notice not a trial issue but simply part of any class claimants' normal burden of proving class membership. Except in an unusual case, the fact that damages present individual issues will not defeat certification. *See Green v. Wolf Corp.*, *supra*, 406 F.2d at 301 (damages issues severable); *Cutner v. Fried*, 373 F.Supp. 4, 12–13 (S.D.N.Y. 1974); *Herbst v. Able*, 47 F.R.D. 11, 17 (S.D.N.Y. 1969); Advisory Committee Note, Proposed Amendments to the Rules of Civil Procedure, 29 F.R.D. 69, 103 (1966); 3B Moore's Federal Practice ¶ 23.46[2] at p. 23–407 (2d ed. 1981) (securities actions). Accordingly, the predominance requirement is met.

#### b. *Superiority.*

"That common questions predominate is not itself sufficient to justify a class action under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages... " Advisory Committee Note to Proposed Rule of Civil Procedure 23, *reprinted* at 39 F.R.D. 98, 102–03 (1966).

The putative class claimants paid little, if any, attention to this important consideration when they first sought certification. That they were seeking certification in the midst of an interpleader action well along toward fruition was a fact largely ignored by the class claimants. Because the court was given to believe that all possible tour participant claimants had been joined as interpleader defendants and because of the cornucopia of individual issues raised by the initial certification motions, it could not be said on the record presented to this court in 1980 that the class mechanism promised any benefit.

The intervening year has brought a gross reduction in the scope of class questions for which certification is sought, new facts from discovery, and newly presented legal authority. Thus it may now be found that reliance on some class mechanisms will result in substantial benefits. First, since additional common issues have been identified and numerous individual issues eliminated by the putative classes streamlining of their claims, it appears that litigation of issues and proof of claims through the class mechanism will result in substantial economies of time, cost and effort. *See Russian Travel Bureau, Inc. v. Marshall Grossman, et al.*, 80 Civ. 476 (S.D.N.Y.) (Pierce, J., Opinion and Order dated April 10, 1980) (utilizing class mechanisms within interpleader action) and cases cited in Plaintiffs' Supplemental Memorandum Of Law Re: Motions To Reargue And Renew Prior Motions Re: Class Certification, dated August 5, 1981. Second, it appears that class certification will advance the equitable goal of permitting all those with a claim against these limited funds an opportunity to assert their claims. *See* Reply Memorandum Of Law In Support Of Motion To Renew And Reargue The Motions Of Claimants Reiken, Dupack, Low and Klakis Seeking Certification of Class Claims and Class Cross-Claims,

---

the outcome of the controversy, *see Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974), they are members of the class they purport to represent, and they claim injury flowing from the alleged class wrong. *See Sosna v. Iowa*, 419 U.S. 393, 402–03, 95 S.Ct. 553, 558–59, 42 L.Ed.2d 532 (1974). Generally, when the Rule 23(a) prerequisites are met, there will be standing, since those prerequisites demand that the plaintiff alleged injury resulting from a class wrong. *See* IH. Newberg, *supra*, at 1120(K); Reply Memorandum Of Law By Class Action Defendants, dated September 25, 1980, at Appendix A, pp. 6–8.

dated March 24, 1981, at pp. 4–20. Since their discovery into Nationwide's claims handling procedure, the putative classes have come forward and shown that many putative class members who may have claims against the interpleaded funds have not been notified of this action. First, it was Nationwide's policy to reply to complaint letters about hotel-switching and flight delays with a letter denying liability for such occurrences. Nationwide did not view these complaints as claims and may never have told plaintiffs about them. *See* Supplemental Affidavit In Support Of Motions Seeking Renewal And Reargument ..., dated August 5, 1981, at ¶ 10 and Exhibits A, B, C; Memorandum Of Law Of Nationwide Leisure Corporation Submitted In Response ..., (undated), at 1–5 (arguing that hotel switching and flight delay complaints were not valid claims). Since plaintiffs apparently did not know about the bulk of these complaints, plaintiffs were not able to serve notice on the complainants. A second reason to doubt that every class claimant has been served is that when Nationwide moved out of its offices in 1978, large numbers of documents were lost and destroyed. Among these may have been claim documents, and plaintiffs could not have known about these.

Fidelity does not know whether Nationwide handled complaints properly or told Fidelity about all of them, Affidavit of Steven A. Weissman, dated October 7, 1981, but Fidelity argues that, given the lapse of time since Nationwide's demise and the extensive publicity about widespread customer dissatisfaction with Nationwide tours, anyone who wanted to press a claim would have complained or sued by now. *Id.*; Affidavit of Henry James Wallach, dated October 9, 1981. The persuasive force of this position, however, is attenuated because some class members may have complained to Nationwide but not been served because Nationwide never told plaintiffs about their claims. Further, that few individual hotel-switching suits were brought against Nationwide seems less suggestive of a lack of interest in asserting legal rights than of the possibility that, without the class mecha-

nism, a lawsuit would be economically impracticable because not enough damage was suffered by individual class members. *See Cutner v. Fried, supra,* 373 F.Supp. at 13.

■ Another point made by Fidelity is this:

> Even assuming for the sake of argument that there are possibly thousands of persons with claims against NLC who are not parties to this action (an assumption contrary to fact and logic, as set forth in the affidavits of Steven A. Weissman sworn to October 7, 1981 and Larry M. Carlin sworn to October [9], 1981), that supposed "fact" is totally irrelevant to the question here under consideration—whether to certify [the] classes.

Affidavit of Henry James Wallach, dated October 9, 1981, at p. 2. The connection perceived by the court between the existence of numerous strangers to this action who may be claimants to the fund and the certification of classes is the court's responsibility to insure, within practicable limits, that the fund now with the court is not distributed inequitably. Interpleader is an equitable device, and its objectives go beyond protection of a stakeholder—especially where, as here, the court's restraining power under 28 U.S.C. § 2361 has been invoked and this litigation may be the only way that claimants can get any sort of recovery. *See Maryland Casualty Co. v. Glassell-Taylor & Robinson,* 156 F.2d 519, .523–24 (5th Cir. 1946) (objectives of interpleader are to give "all claimants to the fund, as well as the holder of the fund" protection); *Commercial Union Insurance Co. of New York v. Adams,* 231 F.Supp. 860, 867 (S.D. Ind. 1964) ("Two of the prime purposes of the interpleader statute are to avoid multiplicity of actions and to avoid an inequitable division of a common fund when the fund is insufficient to pay all the claims against it.") Here, the court has two $200,000 funds, one created for the benefit of, and another perhaps reachable by, classes of claimants who (except for a few) were never served with notice in this action yet are restrained from prosecuting any other ac-

tion to prove their claims. Whether Fidelity should be compelled to locate and serve those for whom the rider was created is not a genuine question here: no party has suggested that such a duty is concomitant to Fidelity's position as interpleading plaintiff, and while equity may demand that an effort be made to involve all interested parties, it does not demand that that effort be made twice. (Practically speaking, if Fidelity were to serve class members, class actions might not be possible, since the class members would then be parties and subsequent notices from class counsel to them might raise ethical problems. Even if no such ethical problems existed, waste in the form of double notice would result.) But that putative classes with colorable claims against the funds should be permitted to prosecute those claims, even though at a cost of substantial delay in the resolution of this action, seems clear, given the objective of equitable distribution of a limited fund among all those with an entitlement.[7]

c. *Class Claims, Cross-Claims and Jurisdiction.*

■ The putative classes make claims against the interpleaded bond and rider and cross-claims against Nationwide, Graff and Nadel. The court has jurisdiction over the claims on the bond because they are "action[s] on a bond executed under any law of the United States..." 28 U.S.C. § 1352. The bond and rider were executed pursuant to the requirements of regulations promulgated by the Civil Aeronautics board, and these regulations constitute "law" within the meaning of § 1352. *See U.S. etc. Miss. Road Supply Co. v. H.R. Morgan Inc.,* 542 F.2d 262, 266 (5th Cir.), *cert. denied,* 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 87 (1976) (department of interior regulations); *United States ex rel. Empire Plastics Corp. v. Western Cas. & Sur. Co.,* 429 F.2d 905, 906

(10th Cir. 1970). Moreover, federal question jurisdiction is alleged and has not been challenged.

The cross-claims clearly are within Rule 13, since the cross-claims arise out of the same transaction or occurrence that is the subject matter of the class claims on the bond and rider, *see* Rule 13(g), and therefore they fall within the ancillary jurisdiction of the court. *See* 3 Moore's Federal Practice, *supra,* at ¶ 13.36 (jurisdiction which supports principal claim supports related cross-claim). Alternatively, considering that the cross-claims and claims derive from a common nucleus of operative fact and that, as they attempted to do in state court, the class claimants would ordinarily claim against the surety funds and Nationwide, Graff and Nadel in one action, pendant jurisdiction may be exercised, since economy, efficiency and fairness would thus be advanced. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

5. *Notice.*

■ Notice must be financed by the class claimants. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 356–58, 98 S.Ct. 2380, 2392–93, 57 L.Ed.2d 253 (1978); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1973). However, class claimants may apply to this court for an order shifting the costs of some class member identification procedures, if the situation is a proper one for such a cost shifting. *See Oppenheimer, supra,* 437 U.S at 356–64, 98 S.Ct. at 2392–96. And, of course, if the class claimants prevail, an application to garner costs and fees from the recovery fund can be made.

The form and procedure of notice may be that set forth in ¶¶ 26–29 of the Dickerson Reply Affidavit of March 24, 1981, or an-

---

**7.** Class counsel also argues that many persons who are *not* class members but nevertheless have claims were not made parties. Class counsel has no standing to make this argument, and, in any event, the showing upon which it is based fails to raise doubt that substantial num-

bers of non-class members with claims were not notified of this action. *See* Carlin Supplemental Affirmation, dated October 9, 1981; Wallach Aff. of October 9, 1981; Weissman Aff. of October 7, 1981.

other form proposed by counsel and approved by the court. If Judge Conner adopts the class certification recommendations, notice shall be mailed within sixty (60) days of the date of that adoption.

## CONCLUSION

Any interested parties may make submissions on class definition or the asserted sixty-day notice requirement within twenty (20) days. *See, supra,* at pp. 54–57. Upon receiving these submissions, recommendations on these matters shall be made. Since this Memorandum Opinion makes no final recommendations, parties are requested to reserve any objections to Judge Conner on the matters raised in this Memorandum Opinion until further recommendations on class definition and the notice requirement are made.

## RECOMMENDED DECISION ON CLASS CERTIFICATION

KENT SINCLAIR, Jr., United States Magistrate:

In a Recommended Decision dated December 7, 1981, this court recommended that three classes be certified in this action but withheld a final recommendation of certification pending further briefing by the parties. Further briefing was invited on the general question of what definitional language should be used to describe the classes to be certified. Also, the parties were invited to make whatever submissions they desired on the legal sufficiency and scope of what interpleader plaintiff Fidelity has denominated as its "First Defense," a clause in the Bond which limits liability to tour participants who gave notice of claim within sixty (60) days after the termination of the charter tour to which their claims relate. Submissions on these issues were received from Fidelity, Nationwide, Graff & Nadel and the class claimants.

For the reasons given in the Recommended Decision dated December 7, 1981 and the reasons that follow in Part A of this decision, it is recommended that the following classes be certified in this action:

*Class 1*: (Low and Reiken) All participants in Nationwide charter tours to London, England during the period February 4, 1977 through December 2, 1977 who were not lodged in the Kensington Close Hotel, the Park Plaza Hotel, the Royal Kensington Hotel, or a similar hotel.

*Class 2*: (Dupack) All participants in Nationwide charter tours to Munich, Germany during the period April 1, 1977 through November 5, 1977 who were not lodged in a Holiday Inn or similar hotel.

*Class 3*: (Klakis) All participants in the single Nationwide charter tour to Nassau and Paradise Island scheduled for January 22, 1978 through January 26, 1978.

For the reasons that follow in Part B, Fidelity's "First Defense" must be deemed restricted to claims for cancellations provided for in the tour participant contract and only such other individual claims as to which Fidelity can affirmatively demonstrate at trial that a particular tour participant knew of the Bond's provisions.

Parts C and D of this Recommended Decision address other issues raised incidentally by the parties in their submissions. Part C reviews the parties' comments on what would constitute sufficient notice of claim if it were a condition precedent. Part D also deals with a notice issue—not notice of claim, but notice to class members of the pendency of this class action.

Familiarity with prior Recommended Decisions by this court is assumed.

### A. *Class Definition.*

Only Nationwide, Graff and Nadel submitted comments on class certification issues other than the notice requirement, and those comments do not justify any modification of the class definitions tentatively set forth in the December 7, 1981 Recommended Decision. These defendants' comments are in essence a more focused statement of the positions that they have taken throughout the litigation of class certification issues.

First, they press the argument that the classes as tentatively defined fail to satisfy

the common question prerequisite of Rule 23(a)(2) and the requirement of Rule 23(b)(3) that common questions predominate over individual questions. Thus, they argue that class representatives' claims will only raise questions of fact and law common to the class if classes are limited "to include only those tour participants who traveled on the same tour and stayed in the same hotel as the class plaintiffs." Memorandum of Law of Nationwide Leisure Corporation . . . ("Nationwide Mem.") at 24. This is because "the factors which resulted in a tour participant not receiving their [sic] promised accommodations in one instance, has [sic] no relation to another participant not receiving promised accommodations in another instance." *Id.* at 25–26. As a result, it is argued, "a separate inquiry into the circumstances of each tour is necessary to ascertain the reason for the failure to deliver the promised accommodations." *Id.* Further, they say, whether the substituted hotels "supplied to tour participants were 'similar' to the promised hotel will involve forty separate trials and precludes the predominance of any issue." *Id.* at 27. This position is not a frivolous one,[1] but the reasons why it must be rejected are several and quite clear.

■ In the first place, what is relevant to a determination of class certification is the claim of each putative class, not misconstructions thereof by those sought to be charged by the class claims. The classes maintain that they can prevail simply by showing that the promised accommodations were not delivered, regardless of the causes. Nationwide's disagreement[2] with this proposition may be a reason for it to move for dismissal or summary judgment, but it is no grounds for denying certification, an issue which should be treated apart from questions of the merits of claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) (class determination does not depend on existence of cause of action). Thus, there is presently no basis for assuming that the causes for non-delivery of accommodations with respect to each tour will have to be examined.

■ It may, however, be true that the factual issue of the "similarity" of each substituted hotel will have to be examined. Indeed, class counsel has conceded all along that this may be necessary. But the fact that individual issues may exist is not automatic grounds for denying certification, especially in a case such as the present. This is the second problem with these defendants' argument against certification of the classes as tentatively defined. They seize on one set of potentially individual factual issues and ignore the reality that there are many other issues implicated by the classes' claims, nearly all of which are common.[3]

1. *See* Recommended Decision of December 30, 1980. This position is apparently taken only with respect to the Reiken and Low and Dupack classes. The Klakis class as tentatively defined includes only persons who went on the same charter tour as the class representatives.

2. These defendants' disregard for the nature of the classes' claims has led them to make other mischaracterizations (*e.g.* the assertion that the class claims against the funds rest solely on breach of contract) and to cite inapposite authority. They cite *Wilensky v. Olympic Airways, S. A.,* 73 F.R.D. 473 (E.D.P.A.1977), but that case dealt with a claim which required an individual inquiry into why each of 2,000 persons was "bumped" from his jet flight and whether "best efforts" were used by the airlines to carry each passenger. The classes believe they can prove a cause of action just by showing non-delivery, an issue easily proved from Nationwide's records, *see* Nationwide Mem. at Appendix A, p. 21, and do not believe that there is any need to determine whether "best efforts" were used by Nationwide to find similar substitute hotels. While Nationwide, Graff and Nadel disagree with this theory of recovery, their contentions do not bridge the gap between the classes claims here and those in *Wilensky.* Nationwide, Graff and Nadel also cite *Sharp v. Hilleary Franchise System, Inc.,* 56 F.R.D. 34 (E.D. Missouri 1972), which denied certification because (1) the *only* issues were individual; and (2) the class representatives sought to represent persons allegedly injured by business entities other than those which injured the class representatives. That case is obviously not pertinent here.

3. The common issues arise because whether the classes' cause of action is denominated as breach of contract, negligence, breach of federal regulations, *see Bratton v. Shiffrin,* 635 F.2d 1228 (9th Cir.), *cert. denied,* 449 U.S. 1123, 101

Recommended Decision of December 7, 1981, at 7–8. It is not required for class certification that there be no individual issues; the rules only require that common issues exist and that they predominate. Rules 23(a)(2), 23(b)(3). The desire of Nationwide, Graff and Nadel that the many claimants who may wish to seek redress for improper hotel substitutions be denied a forum or compelled to litigate the complex legal issues common to their claims without the aid of counsel should not be satisfied merely because the class claims may involve proof of a limited category of individual fact issues.[4]

A third, clear consideration weighing against their argument is the need for the court to discharge its equitable responsibility as guardian of a limited fund. *See* Recommended Decision of December 7, 1981, at 19–20; *Zients v. LaMorte*, 459 F.2d 628 (2d Cir. 1972); *United Artists Corporation v. Fields Productions*, 363 F.Supp. 903 (S.D.N.Y.1973); *United States v. Herce*, 334 F.Supp. 111 (S.D.N.Y.1971). Certification would therefore be appropriate even if there was merit in these defendants' overblown evaluation of the difficulty and complexity which would accompany proof of the limited category of individual factual issues. The record is clear on Nationwide's vigorous, concerted, and longstanding program to avoid any investigation into the merits of hotel-switching claims by their customers,[5] and the task of this court is not to enlist its resources in aid of that program but rather to see that the merits of all claims to the funds are resolved. *See Zients, supra.*

A second argument made by Nationwide represents a blatant misconstruction of the court's Recommended Decision of December 7, 1981. Nationwide accuses the court of "suggest[ing]" that the thrust of Nationwide's argument [against certification] was that the class plaintiffs lacked standing. Nationwide Mem. at 23. In fact, Nationwide has repeatedly made the argument

---

S.Ct. 939, 67 L.Ed.2d 109 (1981) (recognizing private right of action asserted by classes), or fraud, the claim of only injured class members are the same, the legal issues relative to liability are the same, and the factual issues regarding Nationwide's conduct are the same. Each class relies on the same contract, advertising materials, federal regulations, and bond and rider. Each class member was commonly subject to the same contract between Nationwide and the hoteliers, *i.e.*, it was not Nationwide's practice to reserve rooms for each separate tour but to contract in advance for a given number of rooms to be delivered each week of the tour series. Each class member faces the same defenses.

The sufficiency of the classes' cause of action thus depends on the resolution of (1) common legal issues relating to (a) construction of contract, regulation, and statute; and (b) the law of fraud and negligence; and (2) common factual issues relating to the conduct of Nationwide.

4. Even as to these fact issues, Nationwide, Graff and Nadel grossly exaggerate the complexity of proving them. First, unless they have lost or destroyed the records, they have knowledge of which class members were lodged at which hotels. *See* Nationwide Mem. at Appendix A, p. 21. Second, proof of whether many of the hotels are similar or not will be straightforward. For instance, many of those promised a London hotel found themselves staying at a hotel seventy miles away. It takes no crystal ball to predict that proof of this "similarity" issue will not have to be exhaustive. Thirdly, it is likely that any objective differences between promised hotels and those delivered (and the class claims have been narrowed to rest on objective differences and not subjective ones) can be easily shown by recourse to rate schedules, location, services offered, expert ratings, etc. Indeed, it is hard to imagine how proof of this entire category of factual issues would require more than two or three trial days and a finite number of exhibits, assuming the whole matter could not be handled with affidavits and exhibits on a summary judgment motion.

Nationwide's argument on this score is just a Trojan horse.

5. *See, e.g.*, the record in *Civil Aeronautics Board v. Nationwide Leisure Corp., Joel Se. Nadel; Stuart Graff, et al.*, 74 Civ. 915 (E.D.N.Y.); Exhibits to Notice of Motion Seeking to Renew and Reargue. The action brought by the Civil Aeronautics Board ended in a consent decree and injunction binding Nationwide to provide refunds to tour participants who were victims of hotel switching. The exhibits amply demonstrate Nationwide's program of denying claimants' refunds for hotel switching without investigation. This is not to say that the hotel-switching claims are meritorious, only that the claimants are entitled under Rule 23 to an opportunity to be heard as a class.

that the class representatives lacked standing, but this argument has never been taken as being the "thrust" of their certification opposition. The court, in footnote 6 to the December 7, 1981 decision, merely attempted to summarize the "thrust" of Nationwide's *standing argument*, which had been presented in a less than crystallized fashion. The court concluded that standing exists when Rule 23 is satisfied. Nationwide concedes now that this is a correct legal statement, *see* Nationwide Mem. at 24. If their argument on pp. 23–24 of their memorandum is that the court's tentatively defined classes should be modified because the court based them on an erroneous construction of class representative standing, then their argument must be rejected as utterly contrary to the record.

█ Nationwide, Graff and Nadel's third argument against certifying the tentatively defined classes is an unusual one. It is denominated an "equitable" argument:

... The adversary system within which we operate, although always searching for truth and justice, dictates that only one party be successful in a lawsuit. The existence of separate Federal and State Courts is, of course, Constitutionally mandated.

Within this framework, and given the factual history of this litigation, it is difficult to understand how this Court can *ignore* the clear holdings of the highest Courts in New York involving a statute virtually identical to Rule 23. One week after the final determination of the *Reiken* matter, in which the State Court clearly indicated that the scope of the plaintiffs' classes could be no broader than suggested above, the class plaintiffs shifted gears and came into this Court and sought the same relief which was essentially denied in State Court.

The tenacity or skill of the attorneys in this action is not an issue presently before this Court. In its search for truth, this Court is bound only by legal and equitable principles. (footnote omitted)

Leaving for another day counsel's jurisprudential and metaphysical ruminations, the court interprets this argument as a plea that it invoke its "equitable" powers to put a stop to alleged forum shopping by applying some sort of preclusive effect to determinations on class matters made by state courts [6] interpreting state class action provisions. This argument ignores the fact that the state actions have been stayed and removed to this interpleader action and that there is no authority of which the court is aware that would justify "equitably" applying preclusive effect to non-final state determinations not on the merits simply because one party accuses others of having a particular subjective intent.

### B. *The Sixty-Day Notice Requirement.*

Aside from the arguments made by Nationwide, Graff and Nadel reviewed in the foregoing section, the only other issue addressed by the parties that relates to class definition or certification is the so-called 60-day notice requirement. Out of concern that the resolution of this issue not delay resolution of class certification issues, this court sua sponte brought on a motion *in limine* to consider the viability of this defense and its proper scope, if any.[7] F.R.

---

**6.** Nationwide's statement that the decisions at issue were made by the State's highest courts is false. The decisions came from the Appellate Division, Supreme Court, and limited certification to classes composed of those who took the same tour as the representatives. *See Dupack v. Nationwide Leisure Corporation*, 70 App.Div.2d 568, 417 N.Y.S.2d 63 (1979); *Reiken v. Nationwide Leisure Corporation*, 75 App. Div.2d 551, 427 N.Y.S.2d 235 (1980). One difference between those cases and this one is that those courts construed the class claims as requiring proof of the individual causes of each hotel switch. Another difference is that the state courts used a state law analysis in their cursory opinions that this court believes to be incorrect as a matter of federal law. *Compare Dupack* and *Reiken* with Recommended Decision of December 7, 1981.

**7.** On *in limine* rulings, *see generally, Zenith Radio Corp. v. Matsushita Elec. Ind. Co.*, 505 F.Supp. 1125–1379 (E.D.Pa.1980) at 1140. Even though it has referred to the notice provision as a defense, Fidelity now says that proof of compliance thereof is an element of each claimant's claim against the Bond. For this

Civ.P. 12(f). No party objected to this procedure, and all parties were afforded a two-month period to make whatever submissions they desired. Upon review of these submissions, the applicable law, and the pleadings of the parties, it is clear that the 60-day notice requirement, denominated by Fidelity as a "First Defense", must be declared legally insufficient as a defense to the class claims and to the claims of any interpleader defendant who seeks recovery on any basis not specified as a right to refund for cancellation in the tour participant contract, subject only to Fidelity's ability to prove tour participant knowledge of the Bond's notice provisions from other sources.

Fidelity rests its "First Defense" on some language in the Surety Bond issued by Fidelity in connection with tours taken by the class members and by other claimants to the interpleaded funds. As described in detail below, the Bond was issued pursuant to the Special Regulations of the Civil Aeronautics Board ("CAB") for the benefit of participants in Nationwide tours and with the United States as obligee. The Bond contains the following language:

> "Liability of the Surety under this bond shall in all events be limited only to a tour participant or tour participants who shall within sixty (60) days after the termination of the particular charter or

flight described herein give written notice of claim to the operator/charter organizer, or if he is unavailable, to the Surety, and all liability on this bond shall automatically terminate sixty (60) days after the termination date of the particular charter or flight covered by this bond except for claims filed within the time provided herein.

Fidelity and Nationwide argue that this language sets up a "condition precedent", and that any tour participant who wishes to assert a claim to the interpleaded funds must first demonstrate that he has complied with this condition precedent. Fidelity and Nationwide also assert that the Bond language quoted above was incorporated by reference into the Rider, so that the giving of notice within 60 days is also a "condition precedent" to the assertion of any claim against the Rider funds. For the sake of analysis, and without deciding, it will be assumed that the 60 day notice provision was incorporated by reference into the Rider.[8]

If analysis began and ended with the quoted language of the Bond, it might be thought that compliance with the notice requirement is an express condition precedent to the Surety's obligation to pay on any claim. Fidelity and Nationwide urge that analysis should be restricted to the

---

reason, the court's sua sponte motion could also be viewed as one under Rule 12(b)(6).

**8.** Fidelity, Nationwide and the classes have submitted unsworn-factual assertions concerning the intent of Fidelity, Nationwide and the CAB in creating the Rider. It does not appear that considering such submissions would be a permissible practice under Rule 12(f), and even if it were, the submissions present factual disputes not susceptible to summary resolution without further development.

The primary factual disputes surround the circumstances of the Rider's issuance. The classes assert that the circumstances show an intent by all—principal, surety, obligee—to waive any notice requirement. Thus, the classes point to the fact that the principal, surety and obligee all had notice of the nature and extent of the class claims, and the Rider recites that it is made for the benefit of the class claimants. *See* Amended Complaint at ¶ 15. Fidelity and Nationwide deny this and point to a broad incorporation clause in the

Rider, but their opposing presentation is hampered by some confusion over what version of the "facts" they wish to present. *Compare* Nationwide Mem. at 11 and Wallach Affirmation of February 3, 1982 with Memorandum of Law of Plaintiff Fidelity and Deposit ... ("Fidelity Mem.") at 10 (the former stating that the bond was transformed into a rider and that a new bond was created to secure future tours; the latter stating that the purpose of the rider was to remove encumbrances from the bond, which was then used to secure a new line of tours).

Since these factual disputes cannot be resolved on the present record and need not be resolved if the recommendation *in limine* is adopted, it will be assumed for argument that the Rider to the Bond incorporated the Bond's notice requirement. No recommendation is made, however, that the notice requirement be found to be incorporated into the Rider.

Bond language, that the statutory and regulatory background of the Bond should be ignored, and that the question of whether or not tour participants knew of the provision in the Bond is irrelevant. However, any "condition precedent" that operates against tour participants must be found in their contracts or in the rules and statutes authorizing the Bond, and not in the Bond itself, a document never seen or assented to by tour participants. Once the statutory and regulatory background of the Bond is reviewed, and upon examination of the contracts offered to tour participants, it becomes clear that there is no condition precedent of notice operating against anyone with a claim based on changes in itinerary like hotel substitutions.

1. *The Arguments of Nationwide and Fidelity.*

Initially, only Nationwide accepted the Court's invitation to make a submission in connection with the sua sponte motion to strike. This was anomalous, because the sixty-day notice provision is the defense of Fidelity and Fidelity alone, and Nationwide has no standing to assert the defense on Fidelity's behalf.[9] Most of Nationwide's submission on the notice issue, including reply and surreply papers, is given over to a discussion of the subjective intent of the parties to the Rider, an issue which, as previously indicated, cannot now be resolved. *See* n.8, *supra.* With respect to the notice requirement in the Bond, Nationwide completely ignores the regulations and contracts involved and renders the opinion that "[t]he terms of the bond are clear and unambiguous. As a result, in order to assert a claim under the bond, the requisite notice must have been given by each particular tour participant." Nat. Mem. at 5. Further, Nationwide asserts, the Bond is like an

insurance contract between Fidelity and tour participants, and should be construed according to the rules governing insurance contracts, including the rule that "the notice provision of an insurance contract is a condition precedent to an insurer's liability," *citing Gardner-Denver, Co. v. Dic-Underhill Const. Co.,* 416 F.Supp. 934 (S.D.N.Y. 1977).

After the initial time for making submissions had expired, Fidelity submitted an affirmation endorsing and ratifying the position taken by Nationwide on this and other matters. *See* n.8, *supra.* Then, still later, Fidelity submitted a memorandum and a reply memorandum. Fidelity agrees with Nationwide that the notice provision in the Bond should be enforced just like the notice provision in an insurance agreement. Fidelity also argues that "notice requirements . . . under . . . surety bonds are . . . conditions precedent to recovery . . .", Fidelity Mem. at 15. Although it provides a careful review of relevant regulatory history excerpted in the class claimants' filings,[10] Fidelity submits that it is the Bond that counts, not federal rules or statutes, and that "the [regulatory] history and purpose [are] irrelevant", given the "clear language" of the bond. Fidelity Mem. at 3.

■ The fatal flaw in the arguments of these parties stems from their glib insistence on characterizing the Bond as the source of a condition precedent. Conditions precedent can only be created by statute, rule or by the express or implied terms of an agreement by a party sought to be charged with the condition precedent. 1 Am.Jur.2d § 980 (1962). The Bond is not a statute. It is not a rule. It is not an agreement between Fidelity and the claimant/beneficiaries against whom Fidelity seeks to enforce a condition precedent.

**9.** Nationwide concedes that it may not assert the 60-day notice provision as a defense to any cross-claims against it. Reply Memorandum of Nationwide, dated February 9, 1982, at 3–4.

**10.** Fidelity notes that the informing idea of the notice requirement was to make the bond form more attractive to sureties by providing "a certain knowledge of outstanding claims." Thus, Fidelity notes that "the actual purpose of the

notice requirement should be to permit true identification of liabilities and to establish finality with respect to obligations under the bond," quoting from regulatory history excerpted in class claimants' brief. Fidelity further notes that the regulatory history excerpted in the class claimants' brief refers to the notice provision as a "cutoff period." Fidelity Mem. at 4.

■ The Bond is not like an insurance contract, because an insurance contract, such as those dealt with in the cases cited to the court, is a signed agreement by the party sought to be charged with the condition precedent, *see, e.g. Gardner-Denver Co. v. Dic-Underhill Const. Co., supra,* 416 F.Supp. at 936, n.3 (party against whom condition precedent enforced expressly assented to it). The Bond here was neither seen nor assented to by the claimants against whom Fidelity seeks to enforce a condition precedent. Only Nationwide, Fidelity and possibly the United States (through the CAB) were parties to the Bond and Rider. Amended Complaint, dated April 13, 1981.

The cases cited by Fidelity for the proposition that the notice provision in a bond is a condition precedent running against third-parties [11] fail to establish that proposition because they are all cases where the bond was a contract entered by the person against whom the bond's conditions were enforced, *e.g., Public Warehouses of Matanzas, Inc. v. Fidelity and Deposit Co. of Maryland,* 77 F.2d 831, 832–33 (2d Cir. 1935), or cases where the condition precedent was *not* found in the bond but rather in the statute governing issuance of the bond. *E.g., United States v. H. I. Lewis Construction Co.,* 375 F.2d 194, 201 (2d Cir. 1967).[12]

In fact, courts have refused to enforce alleged conditions precedent of notice in bonds against third-party claimants for whose benefit a bond was issued and who had no notice or knowledge of the bond's provisions. *See, e.g., Purcell v. Keane,* 277 F.Supp. 252, 258 (D.C.Pa.), *aff'd* 406 F.2d 1195 (3d Cir. 1969); *Giordani v. Hoffmann,* 295 F.Supp. 463, 477 (E.D.Penn.1969). Thus, even assuming, contrary to the established rule, that a bond can set up a condition precedent against third-parties for whose benefit the bond was taken out, the condition precedent will be unenforceable unless those third-parties had knowledge of it. *Id.* Thus Fidelity is simply wrong when it states that "a tour participant's knowledge of the bond and its provisions is most likely irrelevant..." Supplemental Memorandum of Fidelity, at 8.

If the sixty-day notice provision is a condition precedent, it must have been made one by statute, rule or agreements assented to by tour participants. Even if a condition precedent could spring from the Bond, the tour participants must have known about it for it to be enforceable. Therefore, applicable statutes, rules and tour participant agreements must be analyzed, the issue of tour participant knowledge of the Bond's terms must be examined so far as is possible within the strictures of Rule 12(f), and the arguments of Fidelity and Nationwide to the contrary are without merit.

## 2. *Statute and Rules.*

■ Congress' broad purpose in delegating to the CAB authority to regulate various recognized forms of travel and charter tours was to serve the public interest in low cost travel. *Transworld Airlines, Inc. v. C. A. B.,* 545 F.2d 771, 775 (2d Cir. 1976); *Pan American World Airways v. C. A. B.,* 517 F.2d 734, 746 (2d Cir. 1975). Congress specifically intended that the CAB attempt to realize this purpose by, inter alia, making the provision of charter and travel tours financially rewarding to the providers, *see, e.g.,* H.R.No.1639, 90th Cong.2d Session (1968), and protecting tour and charter participants from overreaching business practices, *see, e.g., id.*

11. Fidelity has not argued that a condition precedent can be enforced against third-parties through third-party beneficiary analysis, but the usual third-party beneficiary rules do not apply to bond beneficiaries like those here, whose rights must be viewed as "sui generis". J. Calamari & J. Perillo, *Contracts* at p. 623 (2d ed. 1977). Similarly, the rules governing the giving of notice by beneficiaries, as opposed to the insured parties, under insurance contracts are not argued by Fidelity or Nationwide to be applicable here. It may be noted, however, that notice requirements that policy beneficiaries are unaware of are usually not enforced. J. Appleman, Insurance Law and Practice § 4745 (1981).

12. Fidelity does acknowledge that the court in *Lewis* mentioned the statute.

Congress' intent that the CAB's rules governing tours and charters protect travelers and tour participants was made very clear. Title 49 U.S.C. § 1371(h)(2) (1962) gave the board authority to require any charterer or tour operator, including one stop inclusive tour operators like Nationwide, to file a "performance" bond [13] to protect travelers in the event of the tour operator's failure to supply promised services.[14] The legislative history of this provision demonstrates that by giving the CAB this rulemaking authority Congress intended to insure the carrier's financial responsibility and supply some recourse to those who would be otherwise helpless. *Bratton v. Shiffrin*, 635 F.2d 1228, 1231 (7th Cir.), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981).

The CAB acted on this clear directive by including in its Special Charter Regulations, 14 C.F.R. Part 378,[15] some rules designed to effectuate the Congressional intent that the traveling public be protected by surety bond coverage. Noting the need "to insure the financial responsibility of the tour operator to the traveling public," Notice of Proposed Rule Making, 30 Fed.Reg. 281, 282 (1965), in 1965 the CAB made a rule requiring a tour operator to take out a bond insuring (a) his "financial responsibility"; and (b) "the supplying of the transportation and all other accommodations, services, and facilities in accordance with the contract between the tour operator . . . and the tour participant. . . " 14 C.F.R. 378 (1965). The bond to be taken out would benefit anyone to whom the principal might be held legally liable for "failure to perform, fulfill and carry out all contracts, agreements and arrangement . . . for the supplying of transportation and other services pursuant to and in accordance with . . . Part 378 . . ." 14 C.F.R. 378, Appendix (1965).

As noted at the outset, however, protection of tour participants was not the CAB's sole concern in establishing the Special Charter Regulations. The public interest in low cost travel was the all-embracing goal to be effectuated, and this meant that the Board had an obligation to structure its rules so that the provision of low cost travel would be practically and financially possible. Thus, upon learning that some tour operators were having some difficulty in getting bonding companies to bond their tours, the CAB modified its rules governing surety bonds to make it easier for tour operators to acquire bonding. One modification was to permit the bonding company to cancel its obligation at thirty-days' notice. Another was to permit the surety to limit its liability to each tour participant to the tour price.

A third modification addressed an industry belief that the form of bond would be more attractive to sureties if they could be given "a definite date when their responsibility under a particular bond ceases or at least can be measured as consisting of certain specific claims and no more. . ." 32 Fed.Reg. 13,009 (1967). Thus, the CAB decided to modify the surety bond rules by "enabl[ing] the surety to be released from liability to tour participants who do not file a claim" within a certain time. *Id.* Since "the claims in question [would] involve failure to provide the services for which the tour price had been paid," *id.*, or "non-performance of the tour," the CAB believed that it would be reasonable to require tour participants to file claims within sixty-days, *so long as they were told that any claims they wished to file against the surety must be noticed within sixty days and so long as they could proceed against the tour operator whether or not they noticed a claim within sixty days. See, id.*; 33 Fed.Reg.

---

**13.** Although denominated a "performance" bond, it appears that a payment bond was contemplated, since the former undertaking includes an obligation to complete performance, an obligation clearly inapposite to the role played by the Bond in the statutory and regulatory scheme.

**14.** Section 1371 was amended in 1978, with the result that, *inter alia*, the provision regarding bond coverage was renumbered as § 1371(q)(2).

**15.** Part 378 was the predecessor of Part 378a, which regulated Nationwide's activities at all relevant times.

3273 (1968). Accordingly, in February 1968 the CAB amended the Special Charter Regulations to provide (emphasis added):

§ 378.16 Surety Bond

(d) The bond required by this section shall provide that unless the tour participant files a claim with the tour operator within sixty (60) days after completion of the tour, the surety shall be released from all liability under the bond to such tour participant. *The contract between the tour operator and the tour participant shall contain notice of this provision.*

§ 378.17 Contract Between Tour Operators and Tour Participants

... *Contracts between tour operators and tour participants shall include provisions concerning the following matters*:

\* \* \* \* \* \*

(g) Unless the tour participant files a claim with the tour operator within sixty (60) days after completion of the tour, the surety shall be released from all liability under the bond to such tour participant (see § 378.16(d)).

It is significant that the sixty day notice provision was introduced simultaneously with a mandatory requirement that the tour operator notify tour participants in their contracts of the existence of the provision. It would appear plain that the CAB intended that the surety's privilege of being released from liability on claims noticed after sixty days was contingent upon the tour operator's satisfaction of the requirement that tour participants be in turn notified of the cutoff period of their rights against the surety. Indeed, the CAB has stated in this action that the tour operator's failure to satisfy this requirement constitutes a waiver by the tour operator and surety of the sixty day notice provision. *See* Letter of William J. Brennan, dated February 17, 1981.

Over the next several years the Special Charter Regulations governing charter tour surety bonds were modified from time to time. One such modification permitted tour participants to file their claims with the surety if the tour operator was unavailable. So long as the tour operator remained available, however, it was up to tour participants to give notice of claim to the tour operator. Other modifications related to the amount of bonding required and the qualifications of acceptable bonding companies. Prior to adoption of a separate set of regulations governing one stop inclusive tour operators (Part 378a), further changes were made in the form of bond required to be used, with the result that the bond was required to recite that it "shall inure to the benefit of any and all tour participants to whom the Principal may be held legally liable for ... failure faithfully to perform, fulfill and carry out all contracts, agreements, and arrangements made by the principal while this Bond is in effect with respect to the receipt of monies from tour participants and proper disbursement thereof pursuant to and in accordance with Part 378a of the Board's Special Regulations ..." Appendix A to 14 C.F.R. 378a (1975). The part of the Special Regulations describing the purpose of the bonding requirements provided, as in the past, that the Bond was to "insure the financial responsibility of the tour operator ... and the supplying of the transportation and all other accommodations, services, and facilities in accordance with the contract between the tour operator ... and the tour participant..." § 378a.31(C).

To summarize, Congress authorized the CAB to require tour operators to furnish bonds to protect travelers in the event of the tour operator's failure to supply promised services. The CAB heeded this statutory directive. Further, the CAB granted tour operators and sureties the privilege of limiting liability on the bond to claims noticed within 60 days, provided that tour participants were notified that their claims against the surety, but not against the tour operator, would be cutoff if they failed to notify the tour operator (or if he was unavailable, the surety) of their intention to make a claim within sixty days of the completion of the tour.

3. *Tour Participant Contracts.*

█ Until 1979, CAB rules did not require tour operators to secure the assent of

**70**

tour participants to a written contract for a charter tour. Prior to 1979, however, there were CAB regulations in effect which governed contracts between tour participants and tour operators, and, as a practical matter, it can be assumed that nearly everyone who took a Nationwide tour entered the standard form contract or authorized someone to enter the standard form contract on his behalf. As the CAB noted:

> The typical practice up to now has been for operators to provide brochures that contain (1) promotional material about a series of flights or tours, (2) the text of the contract, and (3) a "booking" or "reservation" form for the participant to indicate which flight and ground options he desires, sign, detach from the rest of the brochure, and send along with the check back to the operator or travel agent ...

Consumer Protection for Charter Participants, 43 Fed.Reg. 39807, 39811 (1978). The CAB rule governing contracts between tour operators and participants, § 378a.30, required that certain terms be included in these contracts. For present purposes, the principal requirements, applicable throughout the present class periods, were:

> [378a.30(c–e)] a statement of the tour operator's refund policy with respect to cancellations by him or by the participant and with respect to changes in itinerary [defined in the rule as hotel substitutions and the like];
>
> [(§ 378a.30(i)] a statement to the effect that "the charter operator is the principal and is responsible to the participants in making arrangements for all services and accommodations offered in connection with the tour: *Provided, however,* That this requirement shall not preclude the tour operator from expressly providing in such contract that, in the absence of neg-

ligence on the part of the tour operator, he is not responsible for personal injury or property damage arising out of the act or negligence of any direct air carrier, hotel or other person rendering any of the services being offered in connection with such tour;"

> [(§ 378a.30(j)] a statement to the effect that "unless the participant files a claim with the tour operator or, if he is unavailable, with the surety, within sixty (60) days after ... the tour, the surety shall be released from all liability under the bond to such participant."

14 C.F.R. § 378a.30 (1975).

Nationwide used essentially the same "participant agreement" at all relevant times.[16] It set forth Nationwide's refund policy, which was an extremely limited one with respect to cancellations, and, with respect to itinerary changes, was a policy of no refunds, period.[17] Further down on the page, in a section with the bold face heading "Responsibility and General," the "participant agreement" set forth the responsibility clause required by § 378a.30(i), but then added a host of unauthorized qualifiers and disclaimers that completely strip all meaning from the responsibility clause. In between the "Responsibility and General" paragraph and the "Cancellation and Refund" paragraph, both of which vigorously limited refunds to certain kinds of cancellations and made it clear that any other sort of refund request would be futile, a paragraph with the bold-face heading "Bonding" appears. This paragraph, apparently an attempt to comply with the mandates of § 378a.30(j) and § 378a.31(c), reads in its entirety: (emphasis added):

> BONDING: A surety bond has been issued by Fidelity and Deposit Company of

**16.** Contracts in effect during all relevant times have been submitted as part of the classes' answers.

**17.** In the paragraph entitled "Cancellations and Refunds," Nationwide does not provide for any refunds for itinerary changes. Near the end it says "Nationwide Leisure Corp. shall have no liability ... for deviations from itinerary." Further on in the contract, which is easily read

only using a magnifying glass or a microscope, in the paragraph entitled "Responsibility and General," Nationwide again states unequivocably that in "the event there is a deviation from the itinerary ... no refunds will be made." Besides including the above, the contract covering the Munich tour also provided: "Nationwide ... reserves the right ... to make changes in the itinerary."

Maryland, 10 William St., N.Y., N.Y. 10038. *All claims for refund provided in this participant agreement* must be filed with Nationwide Leisure Corp. Only if Nationwide Leisure Corp. is unavailable should such claims be filed with the surety. In either case, *all claims for refund provided for in this participant agreement must be filed as directed in this paragraph within 60 days after the completion of the charter or tour,* or the surety shall be released from all liability under the bond to such participant.

Thus, the "Bonding" paragraph required claims for refunds for cancellation (the only ones "provided in this participant agreement") to be filed within sixty days. The tour participant agreement was silent on a time requirement with respect to any other sort of claim against Nationwide or the Bond.

4. *The Insufficiency of Fidelity's Defense.*

Analysis of the foregoing produces the following conclusions.

 The statutory and regulatory bonding scheme, intended for the protection of tour participants, permitted the surety and tour operator to cause release of the surety as to any claim against the Bond that was not noticed within sixty days. As a condition to this privilege, however, they were required to notify tour participants of the sixty-day cutoff period of their rights against the surety. There can be no doubt that the rule established this as a mandatory duty. *See* Sutherland, Statutory Construction §§ 25.04, 31.06 (1972) (use of "shall" in rule or statute indicates intention that act to be performed was mandatory, not directory); *Escoe v. Zerbst,* 295 U.S. 490, 55 S.Ct. 640, 79 L.Ed. 1240 (1935); *United States v. St. Regis Paper Co.,* 355 F.2d 688, 692 (2d Cir. 1966) (if from the legislative intent, it appears that a requirement is so essential a part of the plan that legislative intent would be frustrated by a noncompliance, then it is mandatory); *Vaughn v. John C. Winston Co.,* 83 F.2d 370, 372 (10th Cir. 1936); *United States v. One 1960 Ford,* 213 F.Supp. 562 (D.C.Tenn.

1962) (construe statute as mandatory where to construe otherwise would result in serious impairment of public or private interests intended to be protected by statute.). And it is clear that failure to perform that duty must result in a loss of the privilege that was conditioned upon the performance of that mandatory duty. 73 Am.Jur.2d §§ 15, 16, 27 (1974), and cases there cited (compliance with mandatory provision is a condition precedent to the privilege conferred). Here, the rule permitted Nationwide and Fidelity to take advantage of the cutoff period as to all claims against the Bond, so long as they put such a provision in the tour participant contract. But the tour participant contract provided only for a cutoff period of claims relating to tour cancellation, and not for a cutoff period as to claims based on itinerary changes, or as to other possible claims against the Bond. As a result, any cutoff period for itinerary change claims or the like was waived by Nationwide and Fidelity. Put another way, the consequence of their failure to carry out a duty mandated by rule is the loss of the privilege made contingent on fulfillment of that duty.

It is clear that Fidelity and Nationwide's failure to articulate the cutoff period as to all claims against the Bond except for cancellation claims did not result from an excessive solicitousness on their part for the rights of tour participants. Rather, it appears that in their overreaching efforts to achieve the unauthorized result of escaping all liability for Nationwide's defalcations by writing out of the contract the responsibility clause required to be there by rule, Nationwide failed to notify tour participants that all Bond claims, not just cancellation claims, must be noticed within sixty days. Nothing in the rules permitted Nationwide to limit Bond liability to cancellation claims; rather, everything in the rules, statutes, and the legislative history thereof clearly demonstrated that the Bond was meant to be a recourse for other claims, such as claims based on itinerary changes, besides cancellation claims. It was clearly improper for Nationwide to make such an

effort to eviscerate a bond scheme intended for the benefit of tour participants, and it is ironic indeed that Fidelity and Nationwide now seek to enlist the court's aid in furthering this effort by enforcing a cutoff period that had to be in the tour participant contract to be effective and was not.

Nationwide has in the past stated that, since tour participant contracts had to be submitted to the CAB in advance of the tour as part of the required prospectus package, any prospectus item not objected to by the CAB could be assumed to have CAB approval. This is a demonstrably false statement. Over and over again, the CAB made clear that acceptance by them without protest of items in a prospectus package should not be viewed as an approval or an acknowledgement that the items in the package complied with CAB rules. *See, e.g.,* versions of Part 378 in effect prior to 1975 (explicitly stating that no opinion on prospectus submissions would be given absent request for "Advisory Opinion"). It cannot be said that the CAB approved of Nationwide's efforts to eviscerate tour participant Bond protection or limit refunds to certain kinds of cancellations. It was up to the tour operators, *at their own risk,* to fashion their own refund policies, subject to the mandated responsibility clause (which Nationwide improperly wrote out of the contract). *See, e.g.,* Inclusive Tours by Supplemental Car Carriers . . . , 37 Fed.Reg. 22851, 22852–53 (1977). It was the CAB's policy to leave to the courts—through private suits and enforcement proceedings—the issue of tour operator liability, providing clear guidance in their rules as to the minimum bond coverage and tour operator responsibility.[18] And although it is true that the CAB did not publish an interpretive rule regarding bond coverage until 1979,[19] the rules cannot be read to permit the limitation on Bond coverage that Nationwide attempted to impose. Further, it is proper even in the context of a Rule 12(f) disposition to note that the CAB made clear to Nationwide its views on its refund policy by suing Nationwide from 1975 through 1977 over Nationwide's improper refund policy with respect to itinerary changes, like hotel substitutions.[20]

The question may arise whether it is fair to this fully secured surety already awarded attorney's fees herein, Fidelity, to strike its defense largely because of policies effectuated by Nationwide. The answer is clearly yes. As surety, Fidelity is presumed to know the contents of its principal's contracts, J. Appleman, Insurance Law and Practice, § 5276 (1981). If Fidelity did not like Nationwide's contracts, it did not have to serve as a fully secured surety thereon. It would certainly be bizarre to penalize innocent tour participants from whom Nationwide was trying to strip statutorily mandated bond protection just because Fidelity may have been complacent in the face of Nationwide's overreaching, rather than an active participant therein. And statutes and rules are not to be construed

---

**18.** *See, e.g.,* Interpretation of Regulations Concerning Surety Bonds, 44 Fed.Reg. 44149, 44150 (1979) (after "Nationwide Leisure Corporation" was "sued for improper hotel substitutions . . . the board [did not] examine the nature or plausibility of the claims. . ." Also: "In the past we have not examined the nature of claims against charter operators to see whether they [are covered by the bond].")

**19.** This interpretation dealt with language identical to that in the Bond in this case and the surety bond rule under which the present Bond was issued. The interpretive rule found that the surety bond rule and language provided "unquestionable protection" for hotel substitutions and the like. 44 Fed.Reg. 44,150–51. Although by this time the rules governing the content of tour participant contracts *required*

operators to give refunds for hotel switches, the CAB had earlier expressed its view that such refunds were "already available to participants at common law" and that rules modifying the tour participant agreement were merely to accomplish the "practical" result of making it "(1) more likely that participants could assert their refund rights on the spot . . . , and (2) easier for them to pursue these rights later in Small Claims Court, if necessary, without having to hire a lawyer." Consumer Protection For Charter Participants, 43 Fed.Reg. 39807, 39810 (1978).

**20.** *See,* Consent Decree and Injunction made a part of the Low Answer and Class Action Claim, filed July 22, 1980. *And see* 2A Moore's Federal Practice § 12.21, n.40 (2d ed. 1980).

as if they intended bizarre results, or construed so as to produce an injustice by rendering them ineffective. *United States v. Blasius*, 397 F.2d 203 (2d Cir.), *cert. denied*, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1968).

In the event that Fidelity should continue to assert that the Bond, not the contract or the statutes and rules, creates a condition precedent of sixty day notice, some final words are in order. "It is a fundamental rule of construction that where the contract which is the subject of the performance bond is referred to in the latter, the contract is to be regarded as part of the undertaking of the surety under the bond." *The Home Indemnity Company v. F. H. Donovan Painting Co., Inc.*, 325 F.2d 870 (8th Cir. 1963); *Accord Ruckman & Hansen, Inc. v. Contracting and Material Co.*, 328 F.2d 744 (7th Cir. 1964). And the "provisions of a statute to which a bond is given are to be read into a bond and considered a part of it, and conditions in the bond repugnant thereto are treated as mere surplusage." *Appleman, supra*, at § 5277. Therefore, what is true of any condition precedent running against claimants in the contract or statute is true of any condition precedent running against claimants in the Bond. It would be foolish indeed to construe the Bond (operative provisions of which were prescribed by the CAB itself) so as to find that the CAB intended it to be a means whereby its statutory scheme could be eviscerated. *See United States v. Blasius, supra.*

Moreover, it cannot be said that the tour participant agreements provided tour participants with knowledge that the Bond contained a provision which could cut off their claims for itinerary changes and the like if not registered within sixty days. Therefore, any condition precedent in the Bond would be unenforceable in any event, *see Purcell v. Keane, supra; Giordani v. Hoffman, supra,* unless Fidelity could show that tour participants had knowledge of the Bond's terms from another source, and neither Fidelity's submissions or Rule 12(f) equip the court to make any ruling now on what tour participants may have learned about the Bond from other sources. Fidelity may offer proof at any hearings to demonstrate that particular claimants had knowledge from other sources, and this ruling *in limine* is without prejudice to such an attempt.

## C. *The Nature of Notice by Participants.*

Much of the parties' recent filings was given over to the question of what sort of notice would satisfy the sixty day notice provision in cases where it could be said to be a condition precedent to the assertion of a claim. It is the position of Fidelity and Nationwide that only written notice from a participant would satisfy the requirement. Their emphasis is on sheer literalism. The class claimants urge a more flexible view of the notice provision, and believe that notice to a travel agent would be sufficient.

It is clear that no reasonable interpretation of the notice provision would be as mechanically literal as that urged by Fidelity and Nationwide. *See, e.g., Lewis Construction, supra.* For instance, a large percentage of Klakis class members filed with a Nationwide representative a petition with their signatures on it, and then the Klakis class action was filed within sixty days of the tour. To say that this would not constitute sufficient notice would be to say that the CAB was insistent on the idle and the unreasonable. *And see* 44 Fed.Reg. 44,150–51 (where it is stated that a class action on the part of 100 participants who paid $500 each for their tours would be construed as impairing the Bond in the amount of $50,000). Similarly, it cannot reasonably be argued that the letter of a travel agent on behalf of identified tour participants would not satisfy the notice provision. Whether the mere making of a complaint to a travel agent would be sufficient is a more difficult question, although the CAB has recognized that the travel agent is the agent for the tour operator for some purposes, such as accepting payments.[21] Similarly, the question of whether notice would have to be in writing does raise a genuine issue. It is not

---

21. *See, e.g., OCAW v. United Airlines*, 73 CAB Reports 1075 (1977).

altogether clear whether the provisions in the contracts and Bond calling for written notice are directory or mandatory.

Further, to the extent that the notice provision is a condition precedent to some claims, compliance could be excused if, under the circumstances, compliance would be meaningless, add nothing or be a gesture in futility. *See, e.g.,* Restatement of Contracts, Second § 255. And it must be borne in mind that it was up to Nationwide to inform Fidelity of Bond claims, so analysis of Nationwide's claim handling procedures would be germane in this regard. Nationwide's rejection of one type of claim as to one tour participant might have to be viewed as a waiver of notice of the same type of claims from other tour participants. *See, Appleman, supra,* § 9081 *et seq.*

It was not the court's intention, when it invited submissions on its sua sponte motion, to decide issues like these. If for some reason it does become necessary to do so in the interest of quickly resolving all issues relative to class certification, then the present submissions on these issues will be treated as motions. Otherwise, if the recommended decision to strike is adopted by Judge Conner, it may be feasible to review on a case-by-case basis the sufficiency of notice in the limited number of cases where it is a condition precedent.

### D. *Issues Concerning Form of Rule 23 Notice to Class Members.*

Nationwide has included in its papers a series of suggestions relating to the form of notice to be sent to class members. The sum and substance of these suggestions is that any class notice that is sent out should be in a form that would make it useful to Nationwide as a discovery device. Nationwide's suggestions are rejected. However, indications by class counsel that his present intention is to seek approval for a notice that would be of no informational value to him or anyone else necessitate a two-fold reminder: (1) the court adheres to the view expressed in its December 7, 1981 Recommended Decision with regard to the funding of notice and other communications

with class members; and (2) this court must approve any form of notice that is sent out. Further, the proposed forms of notice attached by class counsel to his present submissions are unacceptable. Something closer to the proposed form of notice previously approved will be required. The court expects prompt submissions of other proposed forms of notice after a decision on the class matters by Judge Conner.

### CONCLUSIONS

1. The classes as defined herein should be certified.

2. Fidelity's defense denominated a "First Defense" must be declared invalid except as to claims for cancellation provided in the "participant agreement" and subject to Fidelity right to prove claimants' knowledge of the Bond terms from other sources.

3. There is no basis now for determining as a matter of fact or law what constitutes sufficient notice in the limited category of claims where it was required to have been given.

4. Nationwide's suggestions regarding the form of notice are rejected and the court adheres to previously expressed views regarding funding of notice and other communications.